Faisal J. ALBANNA, M.D., Respondent,

v.

STATE BOARD OF REGISTRATION
FOR the HEALING ARTS,
Appellant.

No. SC 89809.

Supreme Court of Missouri,
En Banc.

June 30, 2009.

Glenn E. Bradford, Brian W. McEachen, Glenn E. Bradford & Associates, P.C., Kansas City, MO, for Appellant.

James B. Deutsch, Thomas R. Schwarz, Jr., Blitz, Bardgett & Deutsch, L.C., Jefferson City, MO, J. Thaddeus Eckenrode, Mark D. Schoon, Eckenrode-Maupin, St. Louis, MO, for Respondent.

MICHAEL A. WOLFF, Judge.

## Introduction

This physician disciplinary appeal requires the Court to interpret and apply the statutory grounds of "[a]ny conduct or practice which is or might be harmful or dangerous to the mental or physical health of a patient or the public; or incompetency, gross negligence or repeated negligence" in the performance of professional duties, section 334.100.2(5),[1] and the standard of "unprofessional conduct," section 334.100.2(4).

In doing so, the Court takes note of the distinction between an individual act of professional negligence—which may be remedied in tort law on behalf of an injured person—and unprofessional conduct and other matters specified in the disciplinary statute—which are the regulatory standards that the licensing agency, the Board of Registration for the Healing Arts, applies for the protection of the public.

Although there is a distinction between the licensing discipline standards that the board enforces in the public interest and the tort standards by which private wrongs are remedied, the statute has incorporated "repeated negligence" into the description of disciplinable conduct so that the legal norms for professional discipline and professional liability are related. This is particularly true because "repeated negligence" is defined simply as "the failure, on more than one occasion, to use that degree of skill and learning ordinarily used under the same or similar circumstances" by members of the profession. Sec. 334.100.2(5). Moreover, the definition includes conduct or a practice that is or might be harmful or dangerous to "a patient" as well as the public. *Id.*

The grounds for discipline in section 334.100.2 are many and varied. Because the statute has many specifications, it is important to confine professional discipline to matters that the statute specifies. Within this broad statutory scheme lies wide-ranging discretion for the board to determine which practitioners should be subject to discipline, subject to review of the Administrative Hearing Commission to hear the evidence and decide whether the facts support the board's charges. The commission's decision is subject to review in the courts for legal error, in accordance with article V, section 18 of the Missouri Constitution.

This case is an example of the regulatory scheme in action, for the board instituted an action against Dr. Faisal Albanna, a neurosurgeon, citing six patients who the board believes were injured as a result of Albanna's "unprofessional conduct" and "repeated negligence," among other charges. The commission sustained the board's position as to two of the patients and rejected the board's charges as to the other four. On the basis of the commission's decision upholding the board's position as to the two patients, the board imposed discipline consisting of five years of probation, during which Albanna will be required to obtain extensive informed consent from his surgical patients and to refer them for second opinions prior to performing surgery.

## Factual Background

Albanna has a current and active license to practice medicine in Missouri. He was born in Iraq and educated in Vienna, Austria, where he also completed two years of a general surgery residency and five years of a neurosurgical residency. He is board certified in neurosurgery in Missouri and has been practicing in Missouri since 1987.

---

1. All statutory references are to RSMo 2000, unless otherwise noted.

This appeal arises out of a complaint against Albanna the board filed with the commission in 2003. Relevant to the present appeal are the cases of the two patients—identified as SW and CW—as to which the commission sustained the board's charges of negligence constituting unprofessional conduct.

### Patient SW

SW came to Albanna in 1996 complaining of neck problems causing severe pain and interfering with her ability to work. Prior to seeing Albanna, SW had surgery to fuse two of her vertebrae. Initially, Albanna advised the patient to undergo traction and take a prescribed muscle relaxant—a conservative course of treatment. SW responded poorly to traction, complaining of severe pain both during and after traction. Albanna then ordered a number of diagnostic tests, including a myelogram—an X-ray procedure in which dye is injected into the spine—and an MRI. Albanna interpreted the myelogram to reveal spinal stenosis, a condition in which the spinal cord narrows, pinching spinal nerves.

Albanna recommended that SW continue traction, which SW was reluctant to do. Albanna informed SW that she had three options: 1) live with the pain; 2) continue the conservative therapy; or 3) undergo surgery. SW chose surgery. Following SW's choice of treatment, Albanna surgically fused SW's cervical vertebrae, C3 to C7, and performed a laminectomy, a procedure in which the posterior arch of a vertebra is excised. Following the surgery, SW sought a second opinion from Albanna's former partner, Dr. Greg Bailey, who told SW that the surgery had been unnecessary.

### Patient CW

CW was a construction worker who came to Albanna in 1998 after injuring himself at work, complaining of pain in his legs and back. He had been seeking daily or twice-daily treatment from a chiropractor for three weeks. After conducting a physical examination of CW, Albanna ordered an MRI and a CT scan and diagnosed CW with a "huge disc herniation central in location at L4–L5, mild disc degeneration at L3–L4 and L5–S1, a mild bulge at L3–L4, and moderate disc degeneration at L4–L5." Based on this diagnosis, Albanna recommended that CW undergo a "bilateral lumbar microlaminectomy, microdiskectomy L4–L5, and posterior lumbar interbody fusion." Albanna did not order a bone scan, a diskogram or a back brace.

A posterior lumbar interbody fusion, or "bone fusion," involves the insertion of a hollow metal screw, or "cage," into the spine to fuse together the vertebrae to stabilize them. Before inserting a cage, a surgeon must perform a laminectomy, a procedure removing the back of the spine, to move the nerves out of the way. The cages are filled with bone and inserted into the disk space in the front of the spine. The cages hold the vertebrae in place until the bone fuses. The proper placement of the cages is crucial to prevent the cages from failing to thread into the bone. A diskectomy is a much less complex procedure and involves a simple removal of the herniated disk.

In CW's surgery, Albanna filled the cages with bone material from CW's laminectomy area. Albanna also used a substance called Pro Osteon that was approved for use in bone fractures but had not yet been approved for use in surgical fusions. Albanna did not inform CW that he was intending to use Pro Osteon for an off-label purpose.

After the procedure, CW complained of burning pain in his leg and occasional

numbness and tingling. CW subsequently was admitted to the emergency room, complaining of severe lower back and leg pain. X-rays taken October 29, 1998, showed that the bone had failed to fuse and that the left cage had migrated and was pushing on the nerves in the spinal canal, probably causing CW's leg and back pain. CW saw Albanna in October 1998 and November 1998. Albanna's November evaluation stated that CW's "diagnostic x-rays and CT scan of the lumbosacral spine show unchanged position of the Ray cages and L4–L5 and fusion in progress." The commission found that the October 1998 X-rays indicated that the position of the cages had changed and that the bone was failing to fuse.

CW had subsequent surgery in March 1999 to remove the left cage and perform a bone fusion. This corrective surgery was performed by another surgeon.

### Procedural History

The complaint the board filed alleged violations of section 334.100.2(4) and (5) involving six separate patients. The commission found in favor of the board on two counts, those pertaining to patients SW and CW. Specifically, the commission made the following findings:

First, as regards SW, the commission found that Albanna performed an inappropriate operation on SW and that his conduct amounted to negligence, unprofessional conduct and conduct that might be harmful to a patient.

Second, the commission's findings as to CW can be summarized as follows:

1) Additional diagnostic procedures were necessary before subjecting CW to a fusion as well as a diskectomy, and Albanna's failure to differentiate between muscular and disk pain through such additional procedures violated the standard of care and was conduct that was harmful to the patient;

2) Performing fusion surgery on CW rather than the simpler diskectomy procedure was a violation of the standard of care and was conduct that was harmful to the physical health of the patient;

3) Albanna violated the standard of care in failing to get CW's informed consent to use Pro Osteon off-label;

4) Because Albanna's surgical technique in this case destabilized CW's spine and contributed to the failure of the fusion, aspects of Albanna's surgical technique fell below the standard of care;

5) Albanna's failure to recognize and correct the failed bone fusion violated the standard of care and constituted unprofessional conduct and conduct that was harmful to the mental and physical health of the patient;

6) Albanna's failure to document the full extent of the operation fell below the standard of care;

7) Albanna's representation that CW's fusion was progressing when there was no fusion fell below the standard of care;

8) All of the above stated findings constituted cause to discipline Albanna for unprofessional conduct and conduct that might be harmful to a patient and for repeated negligence in Albanna's treatment of CW;

9) Finally, Albanna's treatment of CW demonstrated a general lack of, or lack of disposition to use, his professional ability, which constituted cause to discipline Albanna for incompetence.

Following the commission's decision, as noted, the board placed Albanna on proba-

tion for five years, which requires expanded informed consent and second opinions.

Albanna petitioned for the circuit court for judicial review. The board did not appeal any of the commission's findings or conclusions. On review, the circuit court reversed the commission's decision that found grounds for discipline. The board appealed to the court of appeals. After opinion by the court of appeals, this Court granted transfer. Mo. Const. art. V, sec. 10.

### Standard of Review

Article V, section 18 of the Missouri Constitution articulates the standard of judicial review of administrative actions. On appeal, this Court is charged with determining whether the agency actions "are authorized by law, and in cases in which a hearing is required by law, whether the same are supported by competent and substantial evidence upon the whole record."

■ On appeal from the circuit court's review of an agency decision, this Court reviews the action of the agency, not the action of the circuit court. *Lagud v. Kansas City Bd. of Police Comm'rs*, 136 S.W.3d 786, 791 (Mo. banc 2004).

■ Some confusion has developed regarding the appropriate level of deference to the decision of the agency. In *West v. Posten Const. Co.*, 804 S.W.2d 743 (Mo.

banc 1991), this Court held that a reviewing court should consider the evidence underlying an agency decision in the light most favorable to the agency's findings. This Court expressly overruled that holding in *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220 (Mo. banc 2003). *Hampton* held that, on appeal, a court reviewing the actions of an administrative agency should make a "single determination whether, considering the whole record, there is sufficient competent and substantial evidence to support the award." *Id.* at 223. This holding abolished the "light most favorable" review standard articulated in previous cases. *Id.*[2]

■ The correct standard of review for administrative decisions governed by article V, section 18 of the Missouri Constitution—which includes healings arts cases—is "whether, considering the whole record, there is sufficient competent and substantial evidence to support the [agency's decision]. This standard would not be met in the rare case when the [agency's decision] is contrary to the overwhelming weight of the evidence." *Lagud*, 136 S.W.3d at 791 (citing *Hampton*, 121 S.W.3d at 223).[3] When the agency's decision involves a question of law, the court reviews the question *de novo*. *State Bd. of Registration for Healing Arts v. McDonagh*, 123 S.W.3d 146, 152 (Mo. banc 2003).

---

**2.** In *Tendai v. Missouri State Bd. of Registration for Healing Arts*, this Court, in the healing arts case, cited a pre-*Hampton* healing arts case, *Mendelsohn v. State Bd. of Registration for the Healing Arts*, 3 S.W.3d 783, 786–87 (Mo. banc 1999), for the proposition that, on review of an administrative decision, "[t]he record is reviewed in the light most favorable to the commission's factual findings." 161 S.W.3d 358, 365 (Mo. banc 2005). This statement of law—"in the light most favorable"—is constitutionally incorrect. *Hampton* states the correct standard for judicial review of administrative decisions. To the extent that *Tendai* and *Mendelsohn* suggest otherwise as

regards the standard of review, they are overruled.

**3.** *Lagud* discusses the interpretation of the standard of review, saying that "[t]his Court must look to the whole record in reviewing the board's decision, not merely at that evidence that supports its decision. To the extent prior cases instruct that on appeal the evidence should be viewed in the light most favorable to the decision of the agency, they should no longer be followed." 136 S.W.3d at 791.

This Court reviews Albanna's appeal in accordance with the standard set in article V, section 18 of the Missouri Constitution and articulated in *Hampton* and *McDonagh*.

## The Statute

The board brought its complaint and the commission made its findings pursuant to section 334.100.2(4) and (5). Section 334.100.2 describes the grounds on which the board may file a complaint against a Missouri-licensed physician:

2. The board may cause a complaint to be filed with the administrative hearing commission as provided by chapter 621, RSMo, against any holder of any certificate of registration or authority, permit or license required by this chapter or any person who has failed to renew or has surrendered the person's certificate of registration or authority, permit or license for any one or any combination of the following causes:

\* \* \*

(4) Misconduct, fraud, misrepresentation, dishonesty, unethical conduct or *unprofessional conduct* in the performance of the functions or duties of any profession licensed or regulated by this chapter, *including, but not limited to,* the following:

\* \* \*

[There are 17 specifications for discipline listed as (a)-(q).]

\* \* \*

(5) Any conduct or practice which is or might be harmful or dangerous to the mental or physical health of a patient or the public; or incompetency, gross negligence or repeated negligence in the performance of the functions or duties of any profession licensed or regulated by this chapter. For the purposes of this subdivision, "repeated negligence" means the failure, on more than one occasion, to use that degree of skill and learning ordinarily used under the same or similar circumstances by the member of the applicant's or licensee's profession[.] (Emphasis added.)

The commission found that in some instances Albanna was unprofessional (section 334.100.2(4)) *and* that his conduct fell below the standard of care (section 334.100.2(5)) *and* was conduct harmful to the patient (section 334.100.2(5)), *e.g.,* the failure to recognize and correct the failed bone fusion in CW. Albanna's treatment of SW was found to be only potentially harmful, rather than actually having caused harm. All of the "harmful conduct" findings regarding CW were findings of actual, not potential, harm. Some of the conduct was found *only* to have fallen below the standard of care *but not* to be unprofessional or harmful to the patient, *e.g.,* Albanna's representation that CW's fusion was progressing when there was no fusion. Finally, some of the conduct was found to have violated the standard of care *and* to have caused harm, *but not* to constitute unprofessional conduct, *e.g.,* Albanna's failure to differentiate between muscular pain and disk pain in patient CW. The commission concluded that the repeated failures to adhere to the standard of care constituted "repeated negligence," within the meaning of 334.100.2(5). The commission also found grounds to sanction Albanna for the instances of harmful conduct (section 334.100.2(5)) and unprofessional conduct (334.100.2(4)). Finally, the commission found that Albanna should be disciplined for incompetence because of his repeated failures to use his professional abilities.

In his appeal to this Court, Albanna disputes the commission's interpretation and application of the statutory language.

■■■■■■■■■■■■

*Unprofessional Conduct*

■ Albanna argues that the commission erred in holding him subject to discipline for unprofessional conduct because it erroneously applied the law and had no evidentiary support for its finding. The commission, citing Merriam–Webster's Collegiate Dictionary, defines "unprofessional conduct" as "conduct that does not conform to the technical or ethical standards of the profession." The commission also cites a definition used in *Perez v. State Bd. of Registration for Healing Arts*, stating that unprofessional conduct warranting revocation of a license consists of "any conduct which by common opinion and fair judgment is determined to be unprofessional or dishonorable." 803 S.W.2d 160, 164 (Mo.App.1991) (citing *Hughes v. State Board of Health*, 348 Mo. 1236, 159 S.W.2d 277 (1942)). This definition is circular and amounts to the statement that unprofessional conduct constitutes unprofessional conduct.[4]

In an earlier time, physicians were disciplined for what the statute simply called unprofessional conduct, with the idea that a licensed professional should know what that phrase means. *See State ex rel. Lentine v. State Board of Health et al.*, 334 Mo. 220, 65 S.W.2d 943 (1933). In recent years the statute has been made far more explicit, giving the profession, the board and the courts a clearer understanding of the conduct, practices or professional failings for which a licensee can be disciplined.

One of the basic causes for discipline in section 334.100.2(4) is stated broadly as "misconduct, fraud, misrepresentation, dishonesty, unethical conduct or unprofessional conduct," which includes "but is not limited to" 17 specific instances, none of which is relied in this case. Separately listed in the same statute are the causes for discipline specified in subsection 5: "Any conduct or practice which is or might be harmful or dangerous to the mental or physical health of a patient or the public; or incompetency, gross negligence or repeated negligence. . . ."

Albanna is correct that none of the experts who testified indicated whether they viewed his conduct as unprofessional. But, under the statute, the commission may make a conclusion of unprofessional conduct in light of evidence that Albanna violated the standards of the profession without an expert specifically testifying that the doctor's conduct was unprofessional. In other words, the conclusion is for the commission to make based upon the expert's testimony as to the medical facts and opinions as to the care.

The commission's findings under section 334.100.2(4) and the parties' arguments tend to exclude the statutory terms "misconduct, fraud, misrepresentation, dishonesty, unethical conduct" as grounds for disciplining Albanna. This leaves "unprofessional conduct." The commission does not explicitly state its reasoning in concluding that Albanna was unprofessional, but it seems to have determined that conduct that has the appearance of being unprofessional does not require expert testimony to establish it as such.

4. *Perez* also states that "[e]xperts are permitted to give their opinions, for the purpose of aiding the court or jury, when a fair and intelligent opinion cannot be drawn from the facts by inexperienced persons." 803 S.W.2d 160, 164. The commission cites *Perez* for the view that conduct that can be determined to be unprofessional or dishonorable using fair judgment does not need to be established through expert testimony. *Id. Perez* involved a fertility doctor who began a sexual relationship with a patient seeking treatment. 803 S.W.2d at 163. The court held that the physician had acted unprofessionally and that no expert testimony was needed to establish that the conduct was unprofessional. *Id.* at 164.

This Court interprets "unprofessional conduct" in this case to refer, first, to the specifications of the matters "including, but not limited to" those 17 grounds specified in as subparagraphs (a)-(q) of section 334.100.2(4). The board did not specify any of the 17 grounds listed in subparagraphs (a)-(q), and it is not within the purview of this Court to speculate as to which grounds the board may have had in mind. The 17 grounds cover a wide range of conduct, and Albanna's failure to recognize the failed bone fusion and his misleading of patient CW falls under some of those grounds. In holding that the commission's finding of unprofessional conduct is supported by the evidence, this Court recognizes that significant notice issues would arise if grounds not based in statutory language, (whether in subparagraphs (a)-(q) or somewhere else in the statute), were attempted to be used to provide a basis for a finding of unprofessional conduct.

This Court concludes that the evidence in the record as a whole supports the commission's conclusion of unprofessional conduct. Accordingly, this Court agrees with the commission that Albanna engaged in unprofessional conduct.

### Repeated Negligence

■ Albanna argues that the commission erred in holding him subject to discipline for repeated negligence. Albanna asserts that the commission did not apply the correct legal standard for medical negligence, that a finding of repeated negligence requires a finding of a gross departure from the standard of care, and that the evidence does not support a finding that Albanna's actions were a clear departure from the standard of care under the medical judgment rule.

Albanna invokes the principle of *noscitur a sociis* in his argument that a finding of repeated negligence requires a finding of repeated gross departures from the standard of care. *Noscitur a sociis* is the principle that words used in proximity to one another must be considered together. *See State v. Bratina*, 73 S.W.3d 625, 627 (Mo. banc 2002) ("The meaning of a word can be ascertained by referring to other words or phrases associated with it."). Albanna argues that because the statute indicates that a physician may be disciplined for "incompetency, gross negligence or repeated negligence," "repeated negligence" must be taken to mean repeated gross negligence or repeated negligence arising to the level of incompetency. This argument fails.

This Court in *Tendai* made clear that each term in the statute—incompetency, gross negligence or repeated negligence—should be given its own individual meaning. *See* 161 S.W.3d at 369 (" 'Incompetency' refers to a state of being. It is clear that incompetency means something different than 'gross negligence' or 'repeated negligence.' Otherwise, there would be no reason to list 'incompetency' in the statute as a separate ground for discipline and 'incompetency' would be redundant.").

Even if there is some ambiguity in the listing of the terms together, the statute goes on to explain explicitly what is meant by "repeated negligence" and provides: "For the purposes of this subdivision, 'repeated negligence' means the failure, on more than one occasion, to use that degree of skill and learning ordinarily used under the same or similar circumstances by the member of the applicant's or licensee's profession." Section 334.100.2(5). There is no reference to a requirement of gross negligence or a serious departure from the standard of care for a finding of repeated negligence, and to give such a meaning to the term "repeated negligence" would rob

the other words in the statute of their meaning. The commission found several instances in which Albanna departed from the standard of care. These repeated departures—involving more than one patient with each departure a discrete decision and resulting act—constitute repeated negligence.[5]

■■ Albanna's final argument regarding the repeated negligence finding is that the commission should have employed the medical judgment rule in evaluating whether Albanna had violated the standard of care. The medical judgment rule, as Albanna argued, is that "[a]s long as there is room for an honest difference of opinion among competent physicians, a physician who uses his own best judgment cannot be convicted of negligence, even though it may afterward develop that he was mistaken." *Haase v. Garfinkel*, 418 S.W.2d 108 (Mo.1967).

Regarding SW, the board presented testimony from Dr. Edward Smith, and Albanna presented testimony from Dr. Terry Lichtor, both neurosurgeons. Dr. Smith testified that Albanna was grossly negligent and performed a surgery far more major and complex than SW required.

Dr. Lichtor testified that although he would have used a more conservative surgery, he believed Albanna was within the standard of care. The commission found Dr. Smith's testimony persuasive. Although this Court considers the record as a whole, the scope of review is to determine whether there was sufficient evidence to support the commission's findings. Given that Dr. Smith was unequivocal in his statement that the surgery was unwarranted, and even that Albanna's expert testified that the surgery was more substantial than what he would have performed, the commission's finding that Albanna fell below the standard of care in his treatment of SW is supported by the evidence.

As to CW, the board presented testimony from Dr. Thomas Freeman; Albanna offered the testimony of Drs. Wilkinson and Raskas. Dr. Wilkinson testified that no further testing was needed to determine whether CW suffered from muscular or disk pain. Dr. Freeman thought that further testing was warranted. Dr. Freeman testified that the fusion was unnecessary and that a less extensive diskectomy would have been sufficient. Dr. Raskas

---

**5.** In *Tendai*, this Court discussed whether a negligent decision not to perform the correct test or advise a patient to seek the correct test that leads to subsequent harms can constitute repeated negligence. 161 S.W.3d 358. The Court in *Tendai* concluded that, as to the single patient involved in that case, there was only a single act of negligence in the treatment decision, though it carried through more than one office visit. In the present case, the Court does not need to reach the issue of whether repeated negligent acts regarding a single patient can constitute repeated negligence because there is more than one patient. The commission found that Albanna was negligent in his treatment of both CW and SW. In the case of CW, the commission found that Albanna had fallen below the standard of care in his failure to differentiate muscular and disk pain, in his failure to seek

additional diagnostic tests, in his failure to get CW's informed consent to use Pro Osteon off-label, in his destabilizing of CW's spine, in his failure to recognize that the bone had not fused properly, in his failure to document the full extent of the operation, and in his notation in the patient's record that the bone was fusing properly when it was not. In the case of SW, the commission found that Albanna's decision to use a surgery that was riskier than the one appropriate for the patient fell below the standard of care. Even if the treatment of CW was to be viewed as a "continuing treatment" case rather than as individually negligent acts, the negligence in the treatment of both CW and SW rises to the level of a failure to adhere to the standard of care on more than one occasion. Albanna's conduct therefore fits within the meaning of the statute's description of "repeated negligence."

testified that he would have performed a fusion, as Albanna had. Both Dr. Wilkinson and Dr. Freeman agreed that images taken after the surgery clearly indicated that fusion was not taking place, despite Albanna's failure to recognize the lack of fusion. The commission found Dr. Freeman's testimony regarding additional diagnostic procedures persuasive. The commission also found that Dr. Raskas's testimony regarding the fusion was less persuasive than that of Dr. Freeman. The commission was persuaded by Albanna's experts regarding a number of points, including that neither Albanna's asymmetric placement of the Ray cages nor his failure to wait six months between diagnosis and surgery violated the standard of care.

Albanna argues that because he presented expert testimony to support his contention that his conduct did not fall below the standard of care, the commission should not have found him negligent. The medical judgment rule does not provide a sure-fire loophole to a finding of negligence. Under Albanna's reading of the medical judgment rule, in any case in which each side presented evidence to support its respective claims of negligence and adherence to the standard of care, a physician facing a charge of unprofessional conduct automatically would prevail. Although Albanna presented expert testimony, the commission was not persuaded uniformly by that testimony. Further, in some aspects of his treatment, such as his failure to get the informed consent of the patient for an off-label use of a drug, there was no dispute that Albanna's conduct fell below the standard of care. The commission's finding of repeated negligence is supported by the evidence.

### Harmful Conduct

■ Albanna argues that the commission erred in finding that he engaged in conduct that is or might be harmful to a patient because the statute is targeted at "conduct akin to quackery" and should not be evaluated through a *post hoc* review of patient outcomes or physician skill.[6] The commission found both potential harm and actual harm resulting from Albanna's conduct. These findings rely on section 334.100.2(5), which proscribes "[a]ny conduct or practice which is or might be harmful or dangerous to the mental or physical health of a patient or the public."

Albanna points this Court to section 334.100.2(4), which authorizes the board to bring a complaint for "[m]isconduct, fraud, misrepresentation, dishonesty, unethical conduct or unprofessional conduct ..." The statute then gives several examples of conduct that would fall under this provision, including "[m]isrepresenting that any disease, ailment or infirmity can be cured by a method, procedure, treatment, medicine or device[,]" section 334.100.2(4)(e), and "[p]erforming or prescribing medical services which have been declared by board rule to be of no medical or osteo-

---

6. The argument headings in Albanna's brief include an argument that the finding of harmful conduct is unsupported by the evidence because there is no evidence that, "but for" Albanna's conduct, the patients would have avoided harm. The "but for" causation argument comes from *Tendai,* in which this Court held that the board must prove the "but for" causation between the doctor's conduct and the harm caused to the patient to sustain a finding of conduct harmful to the patient.

161 S.W.3d at 370. Causation was established in the case of CW. Freeman testified that the slipped cage was pushing into the spinal nerves, causing CW's leg pain. Freeman also testified that the failed bone fusion necessitated the corrective surgery performed by the surgeon from whom CW sought treatment after the surgery performed by Albanna. There was sufficient evidence to support findings of causation and of harmful conduct.

pathic value[,]" section 334.100.2(4)(f). Albanna states that this conduct, the "quackery" outlined in the examples, is the "harmful or dangerous" conduct to which section 334.100.2(5) refers. Albanna argues that the subsections (4) and (5) of section 334.100.2 must be connected to read something like "the board is authorized to bring a complaint against a physician for quackery that might be or is harmful to a patient." Albanna argues that only this reading "completes the statutory scheme" by authorizing discipline for the practice of quackery. Because there was no evidence of quackery, Albanna suggests, there should not have been any findings of actual or potential harm.

A simple reading of the statutory language demonstrates the logical deficit in Albanna's proposed interpretation. Section 334.100.2 describes all of the bases the board can use to bring a complaint against a physician. For example, section 334.100.2(3) authorizes the filing of a complaint for a physician's "[u]se of fraud, deception, misrepresentation or bribery in securing any certificate of registration or authority, permit or license issued pursuant to this chapter or in obtaining permission to take any examination given or required pursuant to this chapter[.]" Not all of the things outlined in section 334.100.2 necessarily cause harm. A physician who fraudulently obtained a license very well may practice competently. The board nonetheless is authorized to bring a complaint against that physician pursuant to section 334.100.2(3).

Albanna was not charged under section 334.100.2(3), the so-called "quackery" statute. The board brought its complaints under sections 334.100.2(4) and 334.100.2(5). The commission interpreted the language of "harm" in section 334.100.2(5) as follows:

We note that "conduct or practice which is or might be harmful to the mental or physical health of a patient or the public" is not only vague, by its terms it encompasses many beneficial practices in the medical field. An obvious example would be chemotherapy. Much of neurosurgery, properly practiced, "might be harmful" to a patient's physical health. In accordance with our decision in *State Bd. of Regis'n for the Healing Arts v. Prince*, No. 03–0384 HA (Admin. Hearing Comm'n Sept. 24, 2004), we conclude that a practice or other conduct is cause for discipline when its harm or danger (that is, its potential harm) outweighs its potential medical benefit. Such conduct or practice might amount to negligence, or it might fall short of that standard.

Although the commission's definition of "harm" makes sense, one cannot ignore the other language in the same paragraph: "incompetency, gross negligence or repeated negligence." This Court applies *noscitur a sociis*—that meaning can be derived from the context of the words in their immediate neighborhood. *State v. Bratina*, 73 S.W.3d 625, 627. In so doing, the Court reads the phrase "conduct or practice which is or might be harmful to the mental or physical health of a patient or the public" as including the concept of unreasonableness. In the context of the whole subparagraph, the Court simply finds implicit in the statutory language the word "unreasonable." As so read, the statute permits the board to sanction "any conduct or practice which is or might be *unreasonably* harmful or dangerous to the mental or physical health of a patient or the public" If the word "unreasonable" is not inferred, a neurosurgeon could be disciplined for practicing neurosurgery, as the commission's quoted definition suggests. A certain number of spine surgery patients are worse off following surgery,

even in the absence of negligence. Neurosurgery, whether practiced skillfully or negligently, by its very nature is conduct or practice that may be harmful to a patient. The purpose of the statute is not to discipline a neurosurgeon for practicing his or her profession. The harm that this provision of the statute seeks to avoid is harm that flows from incompetence, gross negligence or repeated negligence.

In this case, the conduct or practice "which is or might be harmful or dangerous to the mental or physical health of a patient or the public" is the same harm that supports the finding of "repeated negligence." The findings of the commission, as noted, support the conclusion that Albanna's conduct involved "repeated negligence" as that term is used in the statute. Accordingly, the commission's conclusion that Albanna's conduct involved harm or potential harm is supported by the evidence.

### Incompetency

■ Albanna argues that the commission erred in finding cause to sanction him for incompetence. Albanna argues the evidence of his long and successful career is inconsistent with a finding of a general lack of professional ability, the definition Albanna suggests for "incompetence." Section 334.100.2(5) provides the statutory basis for disciplining incompetence. The board may file a complaint for "any conduct or practice which is or might be harmful or dangerous to the mental or physical health of a patient or the public; *or incompetency, gross negligence or repeated negligence ...*" (emphasis added).

The commission defined "incompetence" as "a general lack of, or a lack of disposition to use, a professional ability" (citing *Forbes v. Missouri Real Estate Comm'n,* 798 S.W.2d 227, 230 (Mo.App.1990)). The commission determined that Albanna's

treatment of CW demonstrated a general lack of, or lack of disposition to use, his professional ability, which constituted cause to discipline Albanna for incompetence.

In *Tendai,* this Court reversed the commission's finding of incompetency and discussed the statute's meaning of "incompetency." 161 S.W.3d at 369–370. Dr. Tendai was treating a pregnant patient whose fetus had a two-vessel umbilical cord. *Id.* The standard of care required that the patient have amniocentesis or non-stress testing performed. *Id.* Dr. Tendai did not have the equipment to perform those tests and failed to refer the patient to a perinatologist who could have performed the necessary tests. *Id.* In reversing the commission's finding of incompetency, this Court stated:

"Incompetency" refers to a state of being. It is clear that incompetency means something different than "gross negligence" or "repeated negligence." Otherwise, there would be no reason to list "incompetency" in the statute as a separate ground for discipline and "incompetency" would be redundant. A doctor who is generally competent could commit gross negligence or repeated negligence; thus, "incompetency" must mean something different from these other terms.

*Id.* at 369. The Court reasoned that Dr. Tendai's conduct was evidence of ordinary negligence but not of incompetency. The Court explained that

[n]one of the expert witnesses testified that Dr. Tendai was incompetent. There is no evidence that Dr. Tendai was not legally qualified to practice as a physician. The healing arts board did not present evidence that Dr. Tendai was incapable of practicing medicine or that he lacked the qualities needed for

effective action or was unable to function properly as a physician. *Id.* at 370.

As in *Tendai,* none of the experts who testified in Albanna's case testified that he was incompetent, i.e., unable or unwilling to function properly. The evidence the board cited as demonstrating incompetence is all evidence pertinent to finding Albanna's failures to adhere to the standard of care, *e.g.,* Albanna's failure to get informed consent from CW for the off-label use of Pro Osteon, Albanna's failure to differentiate between muscular pain and disk pain, and so forth. The board states that because Albanna violated the standard of care, the commission was correct in deeming him incompetent.

But, as *Tendai* makes clear, there is a distinction between the statute's word "incompetency" and negligence. Repeated violations of the standard of care constitute repeated negligence, but in themselves, they do not constitute sufficient evidence to prove incompetency. Albanna cites his lengthy record of successful surgeries as evidence that he is not, in fact, incompetent. Indeed, the commission's own findings seem to bear out that argument. The board charged Albanna with misconduct regarding six separate patients. The commission sustained those counts with respect to only two of those patients. The commission explicitly found that as to patients SW, JG, and JD there was no cause to discipline Albanna for incompetency.[7]

"Incompetency," as this Court has said, is a state of being. *Tendai,* 161 S.W.3d at 369. The statute does not state that physicians may be subject to discipline for "incompetent" acts, and reading it in that way would render the "repeated negligence" language unnecessarily redundant. It is possible that a physician could mis-

diagnose a single patient. That single act would not render the physician incompetent, unless the evidence shows that that the misdiagnosis flowed from the physician's incompetence—that is, being unable or unwilling to function properly as a physician. As Albanna argues, an evaluation of "incompetency" necessitates a broader-scale analysis, one taking into account the physician's capacities and successes. As the commission itself recognizes, Albanna is "a surgeon who treats patients with difficult and dangerous conditions that others might not treat." There was ample evidence of his record of successful surgeries in extremely difficult and complex cases. Although he may have been guilty of repeated violations of the standard of care, there is insufficient evidence to support a finding of incompetency. The commission's finding that Albanna was subject to discipline for incompetency is not supported by the evidence.

### Discipline

■ Albanna argues that the board erred in imposing discipline that exceeded the recommendation of its own counsel and the commission. He argues the discipline is arbitrary and capricious in light of discipline imposed on similarly situated licensees and invidiously discriminatory, alleging he has been treated more harshly because of his Iraqi national origin.

The record does not support Albanna's attack on the board's exercise of discretion in its choice of discipline. The decision to place Albanna on probation for five years, requiring explicit informed consent from his surgical patients and second opinions, seems proportionate to the correct findings of unprofessional conduct and repeated negligence. The Court, however, notes that the reversal of the conclusion of incompetence places the record in a differ-

---

7. As to the other patients, there were no find- ings regarding incompetency.

ent posture than when the board considered the appropriate discipline after the commission's decision. Accordingly, a remand is appropriate for the board to reconsider its discipline in light of this Court's decision.

### Conclusion

This Court reverses in part and affirms in part the judgment of the circuit court, as follows: The commission correctly concluded that Albanna was guilty of unprofessional conduct and repeated negligence. This necessarily includes the commission's conclusion that Albanna engaged in conduct or practice "which is or might be harmful or dangerous to the mental or physical health of a patient or the public." To the extent that the circuit court's judgment differs with these conclusions, the circuit court's judgment is reversed. The commission incorrectly found Albanna subject to discipline for "incompetency." To the extent the judgment of the circuit court comports with this finding, that judgment is affirmed. The cause is remanded to the circuit court, which should remand the matter to the board to reconsider the discipline to be imposed.

All concur.