John D. MERWIN, II, M.D., Appellant,

v.

**STATE BOARD OF REGISTRATION FOR the HEALING ARTS,**
Respondent.

**No. WD 75508.**

Missouri Court of Appeals,
Western District.

May 7, 2013.

---

John Landwehr, Jefferson City, MO, for Appellant.

Sarah Schappe, Jefferson City, MO, Glenn Bradford, Kristen Larsen, Kansas City, MO, for Respondent.

Before: KAREN KING MITCHELL, P.J., THOMAS H. NEWTON, and LISA WHITE HARDWICK, JJ.

THOMAS H. NEWTON, Judge.

Dr. John D. Merwin, II, M.D., appeals the decision of the Administrative Hearing Commission (AHC) finding that there was sufficient evidence for the State Board of Registration for the Healing Arts (Board) to discipline his license under section 334.100. Dr. Merwin claims that the AHC's decision to discipline his license was not supported by competent and substantial evidence. We affirm in part and reverse in part.

### Factual and Procedural Background

In 2009, Dr. Merwin was an anesthesiologist at South County Anesthesiology Associates; he was also a co-owner of the medical group. On a Sunday evening, May 3, 2009, Dr. Merwin called the director of the Department of Anesthesiology, Dr. Jeffrey Wilkinson, M.D., to report that he would not be at work on Monday, May 4, 2009, because he had experienced hallucinations. Dr. Merwin told Dr. Wilkinson that the hallucinations were caused by his alcohol use and that, on Monday, he would seek assistance from Missouri Physician Health Program (MPHP). The MPHP is a program designed to assist physicians with substance abuse problems or "other psychiatric or disruptive physician issues." Dr. Wilkinson requested that Dr. Merwin obtain a letter from a profes-

sional stating that he was fit to work before returning to practice. On June 5, 2009, Dr. Merwin received a letter from a board-certified psychiatrist stating that he was fit to return to practice on June 9. The letter also diagnosed Dr. Merwin as alcohol dependent. During Dr. Merwin's absence from May 4 to June 8, his colleagues (twenty-five to thirty doctors) absorbed his duties.

On Monday, May 4, 2009, Dr. Merwin signed a contract with MPHP to voluntarily participate in the program for five years. The next day, however, he negated the contract. Before Dr. Merwin returned to work on June 9, he signed an agreement that conditioned his continued employment on his participation in MPHP. Dr. Merwin, at some point, quit the program. In early September 2009, the director of MPHP informed Dr. Wilkinson that Dr. Merwin was no longer a participant in the program and that they could not certify that Dr. Merwin was fit to work. Consequently, Dr. Wilkinson suspended Dr. Merwin's practice with the group until Dr. Merwin complied with the agreement.

Dr. Merwin sought an alternative treatment program so that he could continue working in the medical practice. In October 2009, he emailed the Board to find an alternative program. He explained his situation to the Board as follows: "I have self-identified and self-intervened and as a result have discontinued my 'nightcaps' for over 5 months. My [medical] group . . . does not want to ignore and then be held legally liable for the situation. Frankly, I understand their concerns for both my welfare and our group's liability." Dr. Merwin asked the Board to recommend a therapist as an alternative to MPHP. In November, after receiving no answer, Dr.

Merwin resigned from the medical group because he refused to return to MPHP and could not find an alternative treatment program that satisfied the terms of the agreement to return to work with his medical group. His resignation became effective in December.

Subsequently, Dr. Merwin interviewed for a position with the University of Missouri Hospital in Colombia, Missouri. Dr. Merwin started the credentialing process in December. He did not mention that the reason for leaving the medical group, after approximately twelve years of employment, was his failure to complete an addiction treatment program. In February 2010, Dr. Merwin was hired as a staff anesthesiologist at the University of Missouri Hospital.

At an investigatory hearing by the Board, Dr. Merwin admitted that his sleep deprivation experienced over the weekend of May 2–3, 2009, was because of alcohol. In October 2010, the Board filed a complaint against Dr. Merwin with the AHC, seeking to discipline his license on three grounds: section 334.100.2(1),[1] section 334.100.2(4), and section 334.100.2(5). During the AHC hearing, Dr. Merwin admitted to using alcohol as a hypnotic (sleep aide) for two years prior to his cessation of alcohol on May 2, 2009. Thereafter, the AHC found that his license could be disciplined on two of those grounds: (1) use of an "alcoholic beverage to an extent that such use impairs a person's ability to perform the work of any profession licensed or regulated by this chapter" and (2) "unprofessional conduct in the performance of professional functions." § 334.100.2(1), (4).

The Board disciplined Dr. Merwin's li-

1. Statutory references are to RSMo 2000 and the Cumulative Supplement 2009, unless otherwise indicated.

cense.[2] His license was probated for five years, and he was required to participate in either MPHP or MAOPS and to submit to drug/alcohol testing. Dr. Merwin sought review in the circuit court.[3] The circuit court affirmed the AHC's decision in part and reversed in part; it determined that Merwin's license could be disciplined based on the ground that his alcohol consumption had impaired his ability to perform the work of his profession. Dr. Merwin appeals.

## Standard of Review

We review the AHC's decision, rather than the circuit court's judgment. *Albanna v. State Bd. of Registration for Healing Arts,* 293 S.W.3d 423, 428 (Mo. banc 2009). We determine whether the decision is supported by sufficient competent and substantial evidence, after considering the whole record. *Id.* We will reverse only if the agency's decision is contrary to the overwhelming weight of the evidence. *Id.* We defer to the AHC's factual determination if supported by substantial evidence. *Tendai v. State Bd. of Registration for Healing Arts,* 161 S.W.3d 358, 365 (Mo. banc 2005), *overruled on other grounds by Albanna,* 293 S.W.3d at 428. However, we review any questions of law concerning an agency's decision *de novo. Id.*

## Legal Analysis

In his first point, Dr. Merwin argues that the AHC's decision is not supported by competent and substantial evidence in the record because his conduct on May 2 and 3 does not qualify as impairment under the statute and any impairment on May 4 was caused by insomnia, not alcohol use. Alternatively, he argues

that if there were alcohol impairment on May 4, it did not constitute "impairment" under the statute because it was for only one workday. He further argues that his absence from work between May 5 and June 9 was a consequence of the agreement with his employer at the time and not due to any impairment.

Section 334.100.2(1) provides that the Board may file a complaint with the AHC against any licensee for the "use of any controlled substance, as defined in chapter 195, or alcoholic beverage to an extent that such use impairs a person's ability to perform the work of any profession licensed or regulated by this chapter." The AHC found that cause existed to discipline Dr. Merwin's license under section 334.100.2(1) because based on Dr. Merwin's hallucinations, which were caused by alcohol use, Dr. Merwin was not able to work as an anesthesiologist from May 2 through June 9.

Dr. Merwin claims that none of the evidence supports a finding that he was impaired from doing his job between May 2 and June 9 because "impairs," requires a showing that the alcohol use impairs "the physician's performance as a physician," and that he was not impaired *while performing as a physician.* As to the dates of May 2 and May 3, Dr. Merwin argues that any impairment from alcohol use over the weekend did not hinder his performance as a physician because he was not scheduled to work or on call those days.

On May 4, according to Dr. Merwin, he was not impaired when he called into work but if he were impaired, it was because he had not slept for two days rather than because of alcohol use. He called in that

---

2. Dr. Merwin admitted during the disciplinary hearing that he was still recovering from alcohol misuse.

3. A stay of the order was issued during the review.

day only because he was experiencing "the effects of the lack of sleep," rather than effects from the "use of alcohol, or even the after-effects of use of alcohol." He further claims that "[i]t was his non-use of alcohol as a hypnotic and his decision to discontinue drinking that caused him to not sleep well and not feel well Monday morning." Because Dr. Merwin's contention is contrary to the Commission's finding that his hallucinations were a result of his alcohol use, we will reject his contention if the record supports the Commission's finding. *See Albanna*, 293 S.W.3d at 428.

At the Commission hearing, Dr. Wilkinson testified that Dr. Merwin called him on Sunday evening and told him "[t]hat he was seeing things, that he felt that he was hallucinating due to alcohol use[,]" and "[t]hat he was going directly tomorrow [May 4] to seek help specifically with Bob Bondurant with the MPHP." Mr. Bondurant was the director of the program. Dr. Wilkinson further testified that he did not recall Dr. Merwin mentioning that he had insomnia. Thus, the record refutes Dr. Merwin's claim of a two-day sleep deprivation as the cause for his impairment. Because this evidence supports the AHC's finding, we reject Dr. Merwin's contention.

■ Turning to Dr. Merwin's alternative argument, we must decide whether this failure to work because of hallucinating due to alcohol use[4] is the type of impairment that the legislature contemplated disciplining. In his alternative argument, Dr. Merwin argues that a single day of alcohol impairment does not constitute "impairment" under the statute. Dr. Merwin relies on *Koetting v. State Board*

*of Nursing,* 314 S.W.3d 812 (Mo.App. W.D. 2010), for support. Although *Koetting* involves the application of a statute disciplining a nurse's license, Dr. Merwin urges us to apply its interpretation because the language of the statute at issue in that case is similar to the language at issue here.

In *Koetting,* a nurse failed to consistently show for her shifts, and missed eighteen workdays over the course of three months. 314 S.W.3d at 814. Her employer discovered that her use of alcohol played a part in her absences, and the parties agreed that the nurse would have a period of unpaid leave to seek treatment. *Id.* In order to return to work, the nurse had to sign an agreement indicating that she was placed on unpaid leave because her alcohol impairment precluded her from meeting the attendance requirements of the job. *Id.* The nurse, however, again failed to show up for her shifts. *Id.* at 815. After discovering that the no-shows were due to alcohol use, the employer terminated her and reported its reason for doing so to the Board of Nursing. *Id.*

The Board filed a complaint seeking to discipline her license under section 335.066.2(1), among others. *Id.* at 815–16. That section allows the discipline of a nurse's license if the nurse's alcohol consumption impairs her ability to perform the work of a nurse. *Id.* at 816. On appeal from the disciplinary decision, this court interpreted section 335.066.2(1) to allow a finding of cause to discipline based upon the existence of off-duty conduct that interferes with job performance. *Id.* at 814, 818. In so holding, we determined that the legislature intended to cover such off-duty conduct, given that a separate

---

4. There seems to be a discrepancy with Dr. Wilkinson's testimony that alcohol use caused the hallucinations and the AHC's finding that Dr. Merwin's hallucinations were due to his nonuse of alcohol. However, as the Board asserts, his nonuse "would not have triggered insomnia or hallucinations and his ability to work would not have been affected" had he not had a habitual use of it. Thus, this distinction is without a difference.

statutory provision for discipline covered improper on-duty behavior and if section 335.066.2(1) were limited to on-duty behavior, there would be no need for the additional provision. *See id.* at 820–21. We also noted that the Board has the duty to prevent its members from harming the public while performing their jobs, even if the potential for harm stems from off-duty conduct. *See id.* at 819.

Thus, we agreed with the AHC that the nurse's "disregard of her professional responsibilities by engaging in alcohol use, which caused a pattern of absenteeism, impaired her ability to work as a nurse." *Id.* at 818. Although the nurse had argued that one occasion of failing to report did not show impairment, this court disregarded that argument in light of the fact that she had numerous absences. *Id.* at 819. We concluded that the nurse's absences were habitual and that her alcohol use impaired her ability to reasonably participate in "the coordination and assistance in delivery of a plan of health care with all of its members of a health team." *Id.* at 819 (internal quotation marks omitted).

Dr. Merwin claims that, because there is no pattern of absenteeism present in his case like there was in *Koetting*, the evidence is insufficient to support a finding that his alcohol use impaired his duty to be a physician. The Board asserts that *Koetting*'s holding was specific to its facts and does not stand for the proposition that absences must be habitual before they can

be used to establish impairment. The Board notes that the focus of *Koetting* was the Nursing Board's duty to protect the public, and the Board points out that its duties mirror those of the Nursing Board, as both have an interest in proactively seeking to prevent harm to the public by their professional members.

We accept Dr. Merwin's invitation to adopt the statutory interpretation in *Koetting*. *See Lane v. Lensmeyer*, 158 S.W.3d 218, 228 (Mo. banc 2005). It is true that, unlike the nurse in *Koetting*, Dr. Merwin did not continue to consume alcohol after he self-reported. However, like the *Koetting* nurse, Dr. Merwin experienced several absences because of his alcohol consumption in that he failed to satisfy the terms of the agreement with the medical group.[5]

Contrary to Dr. Merwin's contention, the reasons that he had to obtain a fit-to-return-to-work letter and enter into an agreement to return to work were that he had experienced some ill effects of alcohol consumption and that he had been diagnosed with alcohol dependence. Although Dr. Merwin's absence from May 5 through June 8 was a product of the letter indicating that he was not fit to return to work during that time, the reason he was not fit to return was due to the effects of his alcohol consumption. Thus, his absence for that period of time was a direct result of his alcohol consumption.[6] Applying the

---

**5.** It should be noted that the nature of Dr. Merwin's job at the time did not involve the care of any assigned patients, unlike the nurse in *Koetting*.

**6.** The AHC specifically found that Dr. Merwin's failure to work as an anesthesiologist from September 4, 2009 through December 15, 2009, was a result of his decision to pursue other employment rather than his failure to participate in any treatment program. The evidence does not support this finding. Dr.

Wilkinson and Dr. Merwin testified that Dr. Merwin attempted to seek alternative treatment from September through October in order to return to practice with his group. Dr. Wilkinson testified that Dr. Merwin resigned in November because he did not want to attend MPHP. Thereafter, he sought other employment. It is thus arguably true that from September through October that Dr. Merwin was not able to work as an anesthesiologist because of alcohol consumption in

statutory interpretation and reasoning in *Koetting*, we find that the evidence supports the Commission's finding that cause existed to discipline Dr. Merwin for his misuse of alcohol under section 334.100.2(1).

Dr. Merwin further argues that "[t]he AHC misapplied the law by equating 'inability to work' with 'impairment' " because the legislature's use of "impair" was "intended to address the knowledge, abilities, and skills necessary to be a physician, not necessarily the physical or legal ability to be present in a certain location on a certain day." The statutory language refutes this contention because it states impairs the "ability to perform the work of [his] profession" rather than impairs the ability to be a physician.

Moreover, "the regulatory standards that the [Board], applies [are] for the protection of the public." *Albanna*, 293 S.W.3d at 425. Several amendments to section 334. 100 reflect the legislature's apparent desire for the Board to intervene for the public's safety when the Board becomes aware, through an employer, that a licensee's alcohol consumption or drug use requires assistance to overcome.[7] Contrary to Dr. Merwin's assertion, the Board does not have wait to first determine that a member's professional skills are affected by the alcohol consumption

before it takes action to prevent harm to the unsuspecting public, staff members, or colleagues.[8] *Cf. State Bd. of Registration for the Healing Arts v. Trueblood,* 368 S.W.3d 259, 268–69 (Mo.App. W.D.2012) (stating that the assurance of the licensee's sobriety through continued monitoring by MPHP and Kansas Medical Advocacy Program and the fact that the programs will alert the Board if she relapsed was sufficient discipline to protect the public). Thus, we reject Dr. Merwin's argument. Dr. Merwin's first point is denied.

■ In his second point, Dr. Merwin argues that the AHC's decision is not supported by competent and substantial evidence because there was "no evidence that alcohol use continued to be a relevant factor in his performance as a physician, and in that the AHC's determination that Dr. Merwin was 'unprofessional' is based on a rejected definition and mischaracterizes testimony." We agree that there was no evidence to support a finding that Dr. Merwin's behavior in failing to disclose to University Hospital his abandoned efforts to seek assistance with his admitted to drinking problem violated any duty of candor.

The AHC decided that cause for discipline existed under section 334.100.2(4) because Dr. Merwin's failure to disclose his history of alcohol abuse was unprofession-

---

that he refused to comply with the return to work agreement.

7. In RSMo 1959, section 334.100.1 listed the ground as "chronic or persistent alcoholism." Subsequently, in RS Mo. 1983, section 334.100.1 was change to list the ground as it reads today: "Use of ... alcoholic beverage to an extent that such use impairs a person's ability to perform the work of any profession licensed or regulated by this chapter." Thus, the change eliminated the requirement to prove an addiction before the Board could intervene.

8. The appellate court stated in *Gaddy v. State Bd. of Registration for Healing Arts*, 397 S.W.2d 347, 355 (Mo.App.1965):

For, it is common knowledge that narcotic drugs produce results other than the mere relief of pain and, in strange and diverse respects, influence and affect the reactions and judgment of users. And if, as others appropriately have pointed out, '[s]uch a blithe spirit is a hazard on the road', certainly he would be, in an examining or operating room, no less 'a hazard' to the life and limb of unsuspecting but trusting patients.

al conduct because "it undermines the hospital's expectation that the physicians considered for employment will disclose relevant information, whether specifically requested to do so or not." The AHC further stated that the temporal proximity between Dr. Merwin's "bottoming out" in relation to applying for a job with the hospital required him to disclose his history to a prospective employer because it was a relevant factor in his performance as a physician.

Section 334.100.2(4) provides that the Board may file a complaint with the AHC against any licensee for "[m]isconduct, fraud, misrepresentation, dishonesty, unethical conduct or unprofessional conduct in the performance of the functions or duties of any profession licensed or regulated by this chapter, including, but not limited to," [a list of situations provided in (a) through (q) ]. *Albanna,* 293 S.W.3d at 429. The *Albanna* court recognized "that significant notice issues would arise if grounds not based in statutory language, (whether in subparagraphs (a)-(q) or somewhere else in the statute), were attempted to be used to provide a basis for a finding of unprofessional conduct." *Id.* at 431.

We do not find any statutory sections, nor does the Board point to any, that require an applicant to disclose the information at issue here under these circumstances. The Board did not present evidence that Dr. Merwin was dishonest in response to a question about his past alcohol consumption or that he misrepresented his reason for leaving his practice. We do not perceive the unprofessionalism in failing to disclose such information under these circumstances when the hospital is mandated to conduct a thorough investigation of any doctor before granting a doctor staff privileges. *See* 19 CSR 30–20.086(2), (4), & (5) (requiring hospitals to investigate physicians before granting staff privileges according to established formal mechanisms that include inquiry of the National Practitioner Data Bank). Consequently, Dr. Merwin's second point is granted.

### Conclusion

Therefore, we affirm the circuit court's decision and the AHC's decision is affirmed in part and reversed in part. Because our decision reverses one of the grounds the Board used to discipline the license, we remand to the Board for it to reconsider its discipline.

MITCHELL, P.J., and HARDWICK, J. concur.