Sherman GEORGE, Appellant,

v.

**CIVIL SERVICE COMMISSION OF the CITY OF ST. LOUIS and the City of St. Louis, Respondents.**

No. ED 93873.

Missouri Court of Appeals,
Eastern District,
Division One.

June 29, 2010.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Aug. 3, 2010.

Application for Transfer Denied
Sept. 21, 2010.

Thomas M. Blumenthal, St. Louis, MO, for appellant.

Patricia A. Hageman, St. Louis, MO, for respondent.

## OPINION

### CLIFFORD H. AHRENS, Judge.

Sherman George appeals the decision of the Civil Service Commission of the City of St. Louis confirming his demotion from the position of fire chief. We affirm.

## Background

Appellant had a long and distinguished career with the St. Louis Fire Department. He began his employment in 1967 and in 1999 became the first African–American to serve as fire chief. Appellant was demoted in 2007 for refusing a direct order from his immediate superior demanding that Appellant fill twenty-eight long-standing vacancies in the fire department.

The City's charter governs the organization of its departments and services. The fire chief oversees more than 700 firefighters and over 200 other employees, primarily emergency medical technicians and approximately twenty civilian employees. The organizational structure of the fire department is a chain of command similar to the police department or, more generally, the military. The fire department is under the department of public safety. The fire chief is appointed by and reports directly to the director of public safety, who is appointed by and reports directly to the mayor.

Promotions within the City's civil service regime, including the fire department, are based on merit and fitness and originate from the department of personnel. Candidates for promotion must successfully complete a competitive examination containing multiple components. The director of personnel is charged with administering the exam. In practice, the exam is often created, administered, and analyzed on the City's behalf by testing consultants with expertise in a given field of service. From the results of the test, the director of personnel generates a list of candidates eligible for promotion and submits that list to the "appointing authority" of a particular department—in this case, the fire chief. The appointing authority draws from the list to select particular individuals for promotion.

As is relevant to the present litigation, the City received ten testing proposals in 2003. The director of personnel chose to implement one that Appellant disfavored. Specifically, Appellant felt that this particular test lacked a sufficient "assessment center" quality characterized by leadership, management, and fire simulation exercises. The City considered the test to contain an adequate assessment center process, and in any event the decision rests with the director of personnel pursuant to the City's charter. Thus despite Appellant's dissent, the personnel director administered the exam and sent Appellant a list of successful candidates in April 2004. In June, Appellant's immediate superior, the director of public safety, instructed him to move forward with promotions. Appellant initially agreed but then expressed concern about racial discrimination in the test. Days later, Firefighters for Racial Equality (FIRE) filed a lawsuit in the U.S. District Court challenging the validity of the test and seeking a preliminary injunction to prevent promotions from the list of successful candidates. In May 2007, the District Court issued its decision finding the test valid. *Stewart v. City of St. Louis*, 2007 WL 6211633 (E.D.Mo.2007), aff'd, 532 F.3d 939 (8th Cir.2008).

Despite the outcome of the FIRE lawsuit, Appellant continued to refuse to fill existing vacancies. No one had been pro-

moted in the fire department in five years. Instead, as was common practice, City firefighters would frequently "ride out of title," meaning they served informally in a rank higher than their appointed rank in order to fill temporary needs. Thus, a private served as captain and a captain as battalion chief on an acting basis, with all the added responsibility but none of the vetting or additional compensation. These circumstances caused Appellant's superiors to express concern about low morale in the department, waning public confidence, and potential liability.

In July 2007, Mayor Francis Slay delivered a letter urging Appellant to proceed with promotions. On September 5, the director of public safety formally ordered Appellant to fill all vacancies by September 14 or be subject to disciplinary action. Appellant interviewed eligible candidates but refused to make any promotions, claiming that he was unable to determine from the test results whether the candidates were qualified.[1] The director then demoted Appellant to the position of deputy fire chief, and Appellant retired shortly thereafter. Concurrently, Appellant filed an appeal with the Commission challenging the validity of the director's order and alleging racial discrimination and constructive discharge.

Following a hearing, the Commission upheld the director's order and found that Appellant's demotion was for good cause, not based on race, and not intended to compel his resignation. Appellant sought judicial review, the circuit court affirmed the Commission's decision, and this appeal followed.

Appellant asserts three points of error: (1) that the order of the director of public safety demanding that Appellant fill vacant positions or be disciplined was unenforcea-ble; (2) that substantial competent evidence demonstrated that Appellant's demotion was racially motivated; and (3) that substantial competent evidence demonstrated that Appellant was constructively discharged.

## Standard of Review

■ On appeal of a circuit court's judgment on a petition for judicial review of contested administrative actions, we review the decision of the administrative agency, not the judgment of the circuit court. Section 536.140.2 RSMo 2000. The appropriate standard of review is whether, considering the whole record, there is sufficient competent and substantial evidence to support the agency's decision. *Albanna v. State Bd. of Registration for Healing Arts*, 293 S.W.3d 423, 428 (Mo.2009). To overcome this standard, an appellant must demonstrate that the agency's decision is contrary to the overwhelming weight of the evidence. *Id.* We defer to the Commission's findings of fact and determinations of credibility. *Perry v. City of St. Louis Civil Service Comm'n*, 924 S.W.2d 861, 864 (Mo.App.1996). Questions of law are reviewed *de novo*. Section 536.140.3; *Albanna*, 293 S.W.3d at 428.

## Discussion

### Enforceability of the Director's Order

■ Appellant first contends that the Commission erred in confirming his demotion because the director's order was unenforceable as a matter of law. In support of his position, Appellant cites *State ex rel. Killingsworth v. George*, 168 S.W.3d 621 (Mo.App.2005), and civil service rule VII § 4. In *Killingsworth*, City firefighters sought a writ of mandamus compelling Appellant to fill ten vacancies in the fire department. This court quashed the writ

---

1. Appellant would later testify that he never     actually reviewed the test or results.

because rule VII § 4 gives an appointing authority the discretion whether (or not) to promote eligible candidates.[2] We explained that, where the act of a public official is discretionary rather than ministerial, such discretion cannot be coerced by the courts, so mandamus will not lie. *Id.* at 625.

But the issue here is not whether a court may coerce Appellant's discretionary act upon writ petition by his subordinates, but whether Appellant may defy with impunity his superior's order to adequately staff his department. As the Commission correctly noted, *Killingsworth* does not trump the basic organizational hierarchy of City government as contemplated in its charter. The fire department is not a chiefdom but rather one division within one department under the ultimate executive authority of the mayor. Article VII § 1 of the charter provides that the mayor is the chief executive officer of the City, exercises all executive power of the City, supervises all executive affairs of the City, sees that each officer and employee performs his duty, and examines the conduct

of any department or office.[3] Under the mayor, Article XIII names the director of public safety as head of the department of public safety, with supervisory authority over the various divisions within it, including the fire department.[4]

Appellant is partially correct that the mayor's influence over hiring and promotions is limited by a distribution of powers: article XVIII charges the department of personnel to identify candidates based on merit,[5] and rule VII § 4 gives discretion to the appointing authority—here, the fire chief—to promote from that pool. This framework ensures objectivity in vetting and leaves individual selections to field-level managers. The appointive discretion conferred by rule VII § 4 is what one would expect of any department head. In the public realm, as *Killingsworth* explains, that discretion in the hands of a public official cannot be coerced by the judicial branch. It does not follow, however, that such discretion is free from oversight by a superior in the executive branch. Indeed, rule VII § 1 contemplates such oversight. It provides that,

2.  Specifically, rule VII § 4 provides the option not to promote by allowing a list of eligible candidates to expire: "The appointing authority or his designee shall interview each available eligible who is certified. Within twenty-one (21) days after such names are certified, the appointing authority shall appoint one of those whose names are certified to each vacancy he or she is to fill.... If no selection is made within the prescribed or authorized period, the certification shall be null and void...." Civil Service Rule VII § 4.

3.  "Article VII: Mayor. Section 1: Powers and duties; compensation. The mayor shall be the chief executive officer of the city and, except as by law or in this charter otherwise provided, have and exercise all the executive power of the city. He shall exercise a general supervision over all the executive affairs of the city and see that each officer and employee performs his duty and that all laws, ordinances, and charter provisions are enforced

within the city.... He may examine the affairs and conduct of any department, board, or office...." City Charter, Article VII § 1.

4.  In particular, section 1 names the director of public safety as head of, and exercising supervisory authority over, the department of public safety, and section 15 places the fire department (formally the "Division of fire and fire prevention") under the department of public safety.

5.  Specifically, section 3(c) provides for competitive examinations "for determining merit and fitness for appointment and promotion to competitive positions...." Section 9(g) charges the director of personnel "to hold examinations, pass upon the qualifications of applicants, and establish eligible lists, as needed, and to certify names of eligibles to appointing authorities for filling vacancies in competitive positions." City Charter, Article XVIII § 3(c) and § 9(g).

though an appointing authority may indicate a preference for a type of appointment (*e.g.*, temporary, term-limited, reassignment, transfer), the final decision rests with the director.[6]

Moreover, rule VII § 4 cannot be construed to override the mayor's chief executive authority under article VII § 1 to "see that each officer and employee performs his duty"—in this case Appellant's duty to adequately staff the fire department. Taken to its logical extreme, such an interpretation would allow appointing authorities to bring City government to a halt. *Killingsworth* should not be understood to prescribe such a result. Though Appellant relies heavily on *Killingsworth*'s observation that, under rule VII § 4, the "discretion to fill or not to fill any particular position remains vested in the appointing authority," that observation must be read in context. As we elaborated then, the rule "contemplates that there will be situations in which the appointing authority will choose, for budgetary, management or other reasons, not to fill a given position." *Id.* at 625. Here, any such division-level managerial concerns were superseded by the express directive of an executive with superior management authority. The mayor included the promotions in the budget and directed that they occur, as was well within his authority under article VII § 1.

Additionally, Appellant's specific justification for defying orders was clearly outside his managerial discretion under the express provisions of the charter. In particular, Appellant refused to promote based on his own belief that the test was flawed. But the charter's framework for hiring and promotions gives no weight to an appointing authority's personal opinion of the eligibility test. Under article XVII, the department of personnel has exclusive authority to determine the method of testing. Moreover, the very test that Appellant criticized here was validated by the U.S. District Court. Appellant thus had no legitimate legal or managerial reason to refuse to carry out the director's order to promote from the list of candidates who passed that test.

We hold that the discretion conferred upon division-level appointing authorities under civil service rule VII § 4 does not supersede the mayor's chief executive authority under article VII § 1 of the City charter, and the authority of the director of public safety as Appellant's immediate supervisor under article XIII of the charter, to direct Appellant to perform his duty to fill vacancies in the fire department. The director's order was enforceable and thus Appellant's demotion for cause was lawful. Point denied.

### *Racial Discrimination*

Appellant also contends that the Commission's finding that race was not a factor in his demotion was against the substantial competent evidence. The City's charter and civil service rules prohibit the City from discriminating against any employee on the basis of race. Article XVIII § 16, Rule XIII § 2; Rule XVI § 1. Likewise, the Missouri Human Rights Act forbids an employer to discriminate against an employee because of his race. Section 213.055 RSMo. Under the Act, an employee alleging racial discrimination must prove that his race was a contribut-

---

6. "Section 1. Types of Appointments: Vacancies in the classified service shall be filled either by original appointment, temporary appointment, limited term appointment, term appointment, reemployment, promotion, reassignment, detail, reemployment from layoff, transfer, or demotion. Appointing authorities may indicate which of these methods they would prefer to have employed in each instance, but final decision shall rest with the Director." Civil Service Rule VII § 1.

ing factor in the employer's decision. *Daugherty v. City of Maryland Heights,* 231 S.W.3d 814 (Mo. banc 2007). The pivotal issue is whether the employer's conduct was motivated by an invidious purpose or whether it was based on a legitimate and rational consideration. *Stanley v. JerDen Foods, Inc.,* 263 S.W.3d 800, 803 (Mo.App.2008).

In its decision, the Commission relied on the testimony of Mayor Slay and the two directors of public safety under the mayor's authority during the relevant period. Samuel Simon issued the initial order for Appellant to promote or be demoted. Charles Bryson succeeded Mr. Simon, reiterated the order, and ultimately demoted Appellant. Their testimony can be summarized as follows.

Mr. Simon chronicled the City's correspondence with Appellant requesting and eventually urging him to carry out promotions. After the District Court's decision in *Stewart,* the city counselor advised Appellant that no legal reason existed for delay. Other correspondence confirmed both the validity of the list of eligible candidates and budget approval for the promotions. Mr. Simon expressed multiple concerns: low morale within the department, waning public confidence, and potential liability for failure to promote,[7] unfair pay practices, and unqualified employees riding out of title. He testified, "I wanted to continue to work with the Chief, address his concerns, and hopefully get him to a point where he would feel comfortable making the promotions himself. I didn't want it to be confrontational or have to give him an order or directive." Mr. Simon further stated that Appellant's race had nothing to do with the order.

Mr. Bryson succeeded Mr. Simon as director of public safety and reiterated his order while also attempting to persuade Appellant to proceed with promotions voluntarily. Mr. Bryson expressed the same concerns articulated by his predecessor: long-standing vacancies "stacking up" within the department, complaints and low morale both within the department and among the public, and untested employees riding out of title. On the afternoon of September 14, 2007, the deadline for Appellant to carry out the order, Appellant met with Mr. Bryson and indicated that he would not make the promotions. One week later, Appellant received a pre-termination hearing on the charge of disobeying a direct order, to which Appellant responded that the order was unenforceable. Mr. Bryson demoted Appellant and hired an interim chief, who proceeded to fill vacancies in the department.

Mayor Slay testified that "[w]e were doing everything we could to try to avoid that situation," referring to Appellant's demotion. Excerpts from a letter to Appellant dated July 2007 illustrate the mayor's plea.

> I support you as chief of the Fire Department and want you to continue to succeed. However, I also believe the department must promote and fear the issue of promotions, if not addressed fairly and immediately, will severely damage your ability to lead the Department.... [A] federal judge has ruled that the current promotional test is valid, does not discriminate, and legitimately tests the skills and knowledge needed to be a captain or battalion chief.... Ignoring the court's clear, unequivocal ruling is creating hard feelings among

---

7. During the relevant period, the City was following litigation in New Haven, Connecticut, where white and Hispanic firefighters sued the city for refusing to certify test results for fear of disparate impact claims by African–American firefighters. See *Ricci v. DeStefano,* —— U.S. ——, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009).

many of the men and women in the department who have waited patiently for promotions. . . .

The voluminous record—over 1300 pages—paints a fuller picture of the foregoing sketch.

In support of his claim of racial discrimination, Appellant extracts portions of the record in which his superiors acknowledge and attempt to address a long history of racial tensions in the fire department. But to label as racial discrimination their awareness of and response to the problem is to mischaracterize the evidence. Again, Mayor Slay's letter illuminates the dilemma. In it he sympathizes with Appellant being torn between opposing groups, namely FIRE on one hand, continuing to dispute the validity of the promotions exam, and members of Local 73, a union of primarily white firefighters, on the other hand, calling for long-overdue promotions. The mayor's letter expresses a desire to work together "to address the rifts in race relations that have developed within the Fire Department, whether based on ill feelings about these promotions or from historic grievances." Appellant similarly distorts his superiors' statements that they would take race into account when considering his replacement. Viewed in context, the record reflects simply that Mayor Slay and his directors remained sensitive to race relations in the department and hoped to identify a new fire chief capable of building cohesion. Appellant was not demoted because of his race. He was demoted for insubordination.

Viewed in its entirety, the record contains sufficient competent evidence from which the Commission could have found that Appellant's demotion was for good cause and not a product of racial discrimination. Point denied.

*Constructive Discharge*

■■■ Finally, Appellant contends that the Commission's finding that he was not constructively discharged was against the substantial competent evidence. Constructive discharge occurs when an employer deliberately renders an employee's working conditions so intolerable to a reasonable person that the employee is forced to quit. *Wallingsford v. City of Maplewood,* 287 S.W.3d 682, 686 (Mo. banc 2009). A plaintiff must establish a discriminatory motive. *Gilliland v. Missouri Athletic Club,* 273 S.W.3d 516, 521 (Mo. banc 2009). A claim of constructive discharge requires more than a single incident but rather a continuous pattern of discriminatory treatment. *Wallingsford,* 287 S.W.3d at 686.

■■■ Appellant cites two intolerable conditions. First, Appellant complains that he was placed under the new interim fire chief, a Caucasian former subordinate who swiftly proceeded to carry out the promotions over Appellant's objections. Second, Appellant laments the decrease in his salary and thus his pension benefits. Demotions and pay cuts are among the factors that federal courts consider in determining intolerability,[8] and Missouri courts take guidance from applicable federal decisions. *Gamber v. Missouri Dept.*

8. In determining whether working conditions are intolerable for purposes of employment discrimination claims based on constructive discharge, courts consider a variety of factors, including: (1) demotion, (2) reduction in salary, (3) reduction in job responsibilities, (4) reassignment to menial or degrading work, (5) reassignment to work under a younger supervisor, (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation, and (7) offers of early retirement or continued employment on terms less favorable than the employee's former status. *Bell v. South Delta School Dist.,* 325 F.Supp.2d 728 (S.D.Miss. 2004) (quoting *Brown v. Bunge Corp.,* 207 F.3d 776, 782 (5th Cir.2000)).

*of Health and Senior Services*, 225 S.W.3d 470, 475 (Mo.App.2007). Indeed, the *Wallingsford* court cited federal precedent in recognizing that claims of constructive discharge often involve demotions and changes in job responsibilities. *Wallingsford*, 287 S.W.3d at 686, citing *Levendos v. Stern Entm't, Inc.*, 860 F.2d 1227, 1230 (3d Cir.1988).

But when an employer has a legitimate, non-discriminatory reason for its actions, a claim of discrimination will fail unless the employee can establish that the reason is a pretext. *Missouri Com'n on Human Rights v. City of Sikeston/Sikeston Power Plant/Bd. of Mun. Utilities* 769 S.W.2d 798 (Mo.App.1989); *Auguster v. Vermilion Parish School Board*, 249 F.3d 400, 402–403 (5 Cir.2001). The ultimate burden of proving that the employer intentionally discriminated against the employee remains at all times with the employee. *Auguster*, 249 F.3d at 402.

Here, Appellant's loss of authority and compensation are natural consequences of a lawful demotion resulting from Appellant's insubordination. The City had a legitimate, nondiscriminatory reason to take disciplinary action. Appellant does not attempt to argue that the City's reason for demoting him was pretextual, and the record contains no evidence to support such an inference. Similarly, the record lacks any evidence that Appellant's superiors said or did anything to harass, intimidate, embarrass, provoke, or otherwise deliberately torment Appellant in a manner characteristic of an intolerable work environment.

The record contains sufficient competent evidence from which the Commission could have found that Appellant was demoted for defying orders and was not constructively discharged. Point denied.

## Conclusion

The City's actions were lawful. The Commission's decision is affirmed.

KATHIANNE KNAUP CRANE, P.J., and ROY L. RICHTER, J., concur.