

# In the Missouri Court of Appeals
# Eastern District

DIVISION FOUR

| | | |
|---|---|---|
| MATTHEW GABLER and STEVEN SCHUTTE, | ) ) ) | No. ED102661 |
| Petitioners/Respondents, | ) ) ) | Appeal from the Circuit Court of St. Charles County |
| v. | ) ) | |
| THE CIVIL SERVICE COMMISSION OF THE METROPOLITAN ST. LOUIS SEWER DISTRICT, | ) ) ) ) ) | Honorable Richard Zerr |
| Respondent/Appellant. | ) | Filed:  December 15, 2015 |

## Introduction

The Civil Service Commission of the Metropolitan St. Louis Sewer District (Commission) appeals from the decision of the St. Charles County Circuit Court reversing the Commission's decision upholding the terminations of Matthew Gabler (Gabler) and Steven Schutte (Schutte) (collectively, Petitioners).  We reverse.

## Factual and Procedural Background

Petitioners were employees of the Metropolitan St. Louis Sewer District (MSD) terminated from their jobs on May 24, 2013, for violating MSD's Civil Service Rule 11.6.b.10.  Civil Service Rule 11.6 provides that disciplinary action, including dismissal, may be taken for certain reasons, including theft, attempted theft, or unauthorized removal of MSD property or property of fellow MSD employees.

Petitioners appealed their dismissals to the Commission. A hearing was conducted over three days on July 9, July 25, and August 29, 2013, before a hearing officer. The evidence presented at the hearing is as follows.

MSD operates a wastewater treatment plant known as the Bissell Treatment Plant, which is comprised of approximately 100 acres and numerous buildings. In April 2013, as part of an ongoing project, MSD was having a disinfection building constructed on the property. MSD retained a contractor, Goodwin Brothers, which in turn hired subcontractors to complete the project.

On May 16, 2013, a representative from Schneider Electric (Schneider), a subcontractor on the disinfection project, contacted Cathy Politte (Politte), the Operations Division Manager at the Bissell Plant, advised her a spool of copper wire was missing from their staging area, and requested to review video of the area to ascertain what happened to it. Schneider started the job in April 2012 and its representative believed the wire had been sitting in the contractor area for several months.

Dave Mattingly, the Bissell Plant engineer, reviewed the videotape. The tape showed that on April 8, 2013, Gabler and Schutte cleaned out the back of an MSD work van and pulled up to the contractor staging area cordoned off by Schneider. The contractor staging area is where Schneider stored the materials used by its workers on the project. Petitioners backed the van up to the silt fence, got out of the van, and lifted the spool of wire over the silt fence and into the back of the van. Petitioners then drove the van to Substation 2/7. Around 10 minutes later, the video showed the van traveling around the incinerator building before disappearing from view. Petitioners did not clean up or remove any other items from Schneider's staging area.

Politte contacted Ron Skief (Skief), the Operations Supervisor, and Jonathan Sprague (Sprague), MSD's Director of Operations, about the issue. Skief checked the van for the wire, but the wire was no longer there.

Sprague attempted to locate Gabler to meet with him but Gabler left work early. Instead, Sprague conducted a meeting with Schutte to question him about the wire. This meeting was also attended by Politte, Skief, and a union representative. Sprague told Schutte that a contractor had complained it was missing a spool of wire and asked Schutte if he knew anything about it. Schutte responded, "No." When Sprague told Schutte that he had a video of him taking the wire and loading it into the van, Schutte said he remembered taking some wire from a contractor area. Sprague testified Schutte appeared visibly nervous, and stated Skief had told Petitioners to clean up the area. Schutte stated the wire had been there for months and Petitioners went there to clean up the area. Sprague testified Schutte acknowledged he knew the wire was not scrap but stated he and Gabler thought it might be MSD wire. Schutte asserted the spool was very light because there was not much wire left on it. Sprague asked Schutte where the wire was, and Schutte stated they left the wire in the van and he did not know where it was.

Sprague testified Schutte stated he and Gabler would have normally put the wire in the warehouse or asked someone where to put it, and could not explain why they left the wire in the van. Schutte stated they did not do anything with the wire and instead drove around with the wire in the back of the van for several weeks before it disappeared. Schutte also stated two other technicians also drove the van. Sprague met with the two other technicians, who denied seeing the spool of wire in the back of the van. Sprague sent Schutte and Skief to search for the spool, but they were unable to locate it.

The next day, Sprague met with Gabler, who denied stealing the wire. Gabler asserted he and Schutte had discussed picking up the wire months earlier and decided to pick it up that day. Gabler told Sprague the spool weighed a couple of hundred pounds and that it took both him and Schutte to load the wire into the van. Sprague testified that Gabler acknowledged they would normally put wire in the warehouse or electrical shop and did not have an explanation for why they left the wire in the van. Gabler asserted the spool disappeared and he did not know what happened to it.

The following workday, Sprague suspended Petitioners pending further investigation by MSD. Sprague testified that during that time, MSD employees reviewed additional video and searched the plant for the missing wire. On May 24, 2013, Sprague terminated Petitioners for theft of MSD property in violation of Civil Service Rule 11.6.b.10.

Sprague testified MSD continued to investigate the incident after Petitioners' terminations. During the pendency of the hearing, Skief located the empty spool in electrical Substation 2/7. MSD also located video from Sunday, April 21, 2013, not a regular workday, of Petitioners loading boxes and bags into their personal vehicles at 6:13 a.m. The video showed them driving to Substation 2/7 and pulling their personal vehicles up to the incinerator stack. Gabler was seen carrying what appeared to be a heavy cardboard box out of the building and putting it in his truck. Schutte was seen putting a bag and a cardboard box into the backseat of his car. MSD also discovered that Goodwin Brothers had invoiced MSD for the wire in August 2012 and that MSD paid the invoice on September 24, 2012.

Skief testified he did not direct anyone, including Petitioners, to clean up or remove anything from Schneider's staging area on April 8, 2013, or the preceding week. Skief testified it did not matter how long items might be in a contractor staging area, that it was not proper for MSD employees to clean up an area staged for contractors. Skief testified the subject area was in the control of Schneider and there is no reason for any MSD employee to remove a spool of electrical cable from that area. Skief testified most of MSD's wire is stored in the warehouse or in the electrical shop. Skief testified Petitioners never explained why they did not move the wire from the van into the warehouse.

At the hearing, Schutte testified that on April 8, 2013, he and Gabler were driving around the plant resetting substation ties. Schutte testified Gabler had been talking about picking up the spool of wire for months, saying it was leftover wire and he needed help bringing it back to the shop. Schutte stated they loaded the wire into the van and did not do anything else with it or remove it from the van. Schutte stated he saw the wire once or twice after April 8, but did not pay attention to it and left it in the van because he "didn't care." Schutte acknowledged he and Gabler drove to Substation 2/7 after picking up the wire and then parked by the stack by the incinerator building. When asked what Petitioners would normally do after picking up something like a spool of wire, Schutte stated, "There is no rules, no set rules. We do whatever we want. We just lay it in the van whenever we get done with it." Schutte testified he did not tell anyone when the spool disappeared because his superiors "don't know what we really do." Schutte acknowledged he had sold scrap wire, including copper, in the past. Schutte testified he always uses his personal vehicle when working overtime, such as on April 21, 2013.

Schutte denied telling Sprague that Skief told him to pick up the area but admitted he had stated on his Department of Labor and Industrial Relations employment claim form that "we were told to clean up an area by our supervisor of all wiring. We did what they said to do." Schutte denied taking the wire off MSD premises.

At the hearing, Gabler testified he suggested picking up the wire. Gabler stated the wire had been sitting in the area for months even though the contractors had finished the job and cleaned up all of the electrical equipment from the area. Gabler did not ask anyone from Schneider if they were finished, and stated he personally decided it should be removed from the contractor area. Gabler testified he and Schutte picked up the wire and put it in the van so they could use it later. Gabler stated the van was considered a storage area. Gabler testified he did not know if the wire was actually in a contractor staging area, and no one told him to remove the wire and place it in MSD storage. Gabler asserted he did not notice when the wire went missing from the back of the van.

Following the hearings, the hearing officer prepared written findings concluding MSD's termination of Petitioners was supported by competent and substantial evidence. The Commission reviewed the hearing officer's findings, the exhibits, and the testimony and prepared a Decision upholding Petitioners' terminations. Petitioners appealed the Commission's decision to the St. Charles County Circuit Court, which entered a judgment reversing the termination decision, finding there was no evidence MSD owned the subject property or that a theft had occurred. This appeal follows.

<u>Points Relied On</u>

In their first point, Petitioners argue the Commission's decision upholding their terminations for theft should be reversed because it was not supported by substantial and

6

competent evidence, in that there was no evidence they removed the wire from MSD's premises.

In their second point, Petitioners argue the Commission's decision should be reversed because the decision is not supported by substantial and competent evidence, in that MSD failed to prove the wire belonged to MSD.

Standard of Review

Article V, Section 18 of the Missouri Constitution establishes the standard of judicial review of administrative actions. On appeal, this Court determines whether the agency's action is "authorized by law, and in cases in which a hearing is required by law, whether the same are supported by competent and substantial evidence upon the whole record." Albanna v. State Bd. of Registration for Healing Arts, 293 S.W.3d 423, 428 (Mo. banc 2009). This Court reviews the determination of the agency, not the circuit court. Id.; George v. Civil Serv. Comm'n of City of St. Louis, 318 S.W.3d 266, 269 (Mo. App. E.D. 2010).

This Court must determine whether, considering the record as a whole, there is sufficient competent and substantial evidence to support the agency's decision. Albanna, 293 S.W.3d at 428. "To overcome this standard, an appellant must demonstrate that the agency's decision is contrary to the overwhelming weight of the evidence." George, 318 S.W.3d at 269. On review, we defer to the Commission's findings of fact and determinations of credibility. Id. Questions of law are reviewed *de novo*. Albanna, 293 S.W.3d at 428.

Circumstantial evidence can constitute competent and substantial evidence. See Boyd v. Civil Serv. Comm'n of City of St. Louis, 657 S.W.2d 83, 86 (Mo. App. E.D.

7

1983) (fact may be proven by direct or circumstantial evidence). "'Circumstantial evidence is evidence which does not directly prove a fact in issue, but gives rise to a logical inference that the fact exists.'" State v. Howery, 427 S.W.3d 236, 245 (Mo. App. E.D. 2014), quoting State v. Fitzgerald, 778 S.W.2d 689, 691 (Mo. App. E.D. 1989). Circumstantial evidence and the permissible inferences from such evidence can be sufficient to prove essential facts and support a verdict. Erdman v. Condaire, Inc., 97 S.W.3d 85, 91 (Mo.App. E.D. 2002)

## Discussion

### Point I – Sufficient, Competent and Substantial Evidence of Theft

On appeal, Petitioners contend the Commission's decision upholding their terminations by MSD for theft is not supported by competent and substantial evidence, in that there was no evidence they removed the wire from MSD's premises. This argument rests upon the fact there is no direct evidence Petitioners removed the wire from MSD's premises and they denied the accusations of theft lodged against them.

As already noted, it is not necessary for MSD to present direct evidence of Petitioners' guilt in order to support its decision to terminate them for theft. In this case, MSD presented circumstantial evidence that was sufficient, competent and substantial to support the terminations.

The evidence showed that on April 8, 2013, Petitioners cleaned out an MSD van, drove to an area cordoned off by a contractor, crossed a silt fence, picked up a valuable spool of copper wiring, and loaded it into the back of the van. Petitioners then drove toward Substation 2/7 before parking in front of the incinerator building. On the morning of Sunday, April 21, 2013, Petitioners were videotaped driving to Substation 2/7 and the

8

incinerator stack, and carrying boxes and a bag out of the building and loading them into their personal vehicles. After an exhaustive search of the plant, the empty spool was located in Substation 2/7. The wire was never recovered.

When questioned about the missing spool of wire, Petitioners provided conflicting statements regarding their knowledge of the wire, the amount of wire removed, whether they had entered a contractor staging area to remove the wire, whether they believed the wire belonged to the contractor or MSD, and whether they were ordered to clean up the area. Neither man could explain why they picked up the wire of their own accord, then left the wire in the back of the van instead of taking it to the warehouse, and were unconcerned when the wire "disappeared."

Evidence was presented that MSD employees were generally not permitted in this area, Petitioners were not directed to remove anything from this area, and it was customary for an item like the spool of wire to be stored in the warehouse or the electrical shop and not in the back of a van. While there is no direct evidence that Petitioners removed the wire from MSD's premises, the record contains sufficient competent and substantial circumstantial evidence giving rise to a logical inference they stole the wire. Although Petitioners denied the accusations against them, we defer to the Commission's findings of fact and credibility determinations. George, 318 S.W.3d at 269.

Point II – Ownership of the Wire

In their second point, Petitioners assert the Commission's decision finding the wire was owned by MSD is not supported by competent and substantial evidence because MSD's attorney stated in his opening remarks that the wire was not MSD property and Politte testified MSD did not own the wire. We disagree.

There is no dispute that MSD's initial position was that the wire was owned by Schneider. However, upon further investigation, MSD discovered that it did, in fact, own the wire at the time of the theft. Although Politte initially stated the wire did not belong to MSD, Politte subsequently testified she did not know if MSD owned the wire at the time of the taking as this information was not within her area of knowledge. At the hearing, MSD presented the testimony of Marco Pizzo, a representative of Goodwin Brothers on the disinfection project, that in August 2012, Goodwin Brothers sent MSD an Application for Payment for work done and materials delivered in July 2012. The Application for Payment was submitted into evidence. Pizzo testified the subject wire was included in this invoice. MSD also presented the testimony of Robert Breig, MSD's assistant secretary treasurer, that MSD paid said invoice on September 24, 2012. Upon review of this evidence, Sprague testified MSD paid Goodwin Brothers for the spool of wire before Petitioners took it. This evidence constitutes sufficient, competent and substantial evidence supporting the Commission's finding MSD owned the wire on September 24, 2012, many months before the taking.

## Conclusion

Based on the foregoing, the circuit court's judgment is reversed. The Commission's decision upholding MSD's termination of Petitioners is reinstated.


_Sherri B. Sullivan_
_____
SHERRI B. SULLIVAN, J.

Lisa S. Van Amburg, C.J., and
Kurt S. Odenwald, J., concur.

10