

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| RACHEL K. WILLISTON, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | WD83295 |
| | ) | |
| MISSOURI STATE BOARD | ) | Opinion filed:  October 13, 2020 |
| OF NURSING, | ) | |
| | ) | |
| Respondent. | ) | |

**APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI**
**THE HONORABLE KENNETH R. GARRETT, III, JUDGE**

Division One:  Thomas H. Newton, Presiding Judge,
Mark D. Pfeiffer, Judge and Edward R. Ardini, Jr., Judge

Appellant Rachel Williston's nursing license was revoked by Respondent Missouri State

Board of Nursing (the "Nursing Board") after it was determined that cause existed to discipline

Williston's license. The discipline imposed was based on the midwife care Williston provided to

a woman ("Mother") and her child ("Baby") during Mother's pregnancy and delivery in 2012.[1]

Williston filed a petition for judicial review in the Circuit Court of Jackson County (the "trial

court"), seeking reversal of the Nursing Board's determination and reinstatement of her license.

---

[1] We use the terms "Mother" and "Baby" to protect the identities of the individuals involved. Additionally, we will refer to Mother's husband and Baby's father as "Father" and Mother's mother as "Grandmother."

The trial court affirmed the Nursing Board's decision, and Williston appealed. For the reasons stated below, we affirm.

## Factual and Procedural Background

Central to Williston's argument on appeal is her assertion that she was not acting in her capacity as a ***nurse*** midwife, but rather as a ***professional*** midwife, when she provided the care that formed the basis for the revocation of her nursing license. For that reason, we begin our recitation of the facts by briefly describing Williston's midwife education and credentials, and the legal framework of her midwife certifications.

Williston graduated from college in 1997 with a Bachelor of Science in Nursing and obtained her Missouri license as a Registered Professional Nurse (or "RN") in 1998. She then attended graduate school and obtained a Master of Science in Nursing in midwifery. In 2001, she passed the nurse midwifery examination administered by the American Midwifery Certification Board and was certified as a nurse midwife by the American College of Nurse-Midwives. She was also recognized by the Nursing Board as an Advanced Practice Registered Nurse. By obtaining both certification as a nurse midwife and recognition from the Nursing Board, Williston held the qualification of Certified Nurse Midwife ("CNM").[2]

In 2007, by the enactment of section 376.1753, RSMo, Missouri legalized the practice of midwifery by lay persons. *See* § 376.1753, RSMo Supp. 2007; *see also Mo. State Med. Ass'n v. State*, 256 S.W.3d 85, 86-88 (Mo. banc 2008). Section 376.1753 provides that "[n]otwithstanding

---

[2] A Missouri licensed nurse may only hold herself out as a "certified nurse midwife" or CNM if she receives recognition from the Nursing Board as an Advanced Practice Registered Nurse. *Williston v. Vasterling*, 536 S.W.3d 321, 334 (Mo. App. W.D. 2017); *see also* 20 CSR 2200-4.100(3)(A). An Advanced Practice Registered Nurse is a registered nurse "who has education beyond the basic nursing education and is certified by a nationally recognized professional organization as a certified nurse practitioner, ***certified nurse midwife***, certified registered nurse anesthetist, or a certified clinical nurse specialist." *Williston*, 536 S.W.3d at 334 (emphasis added) (quoting § 335.016(2)).

any law to the contrary, any person who holds current ministerial or tocological certification by an organization accredited by the National Organization for Competency Assurance (NOCA) may provide [services related to pregnancy (including prenatal, delivery, and post partum services)]." In 2008, Williston obtained credentials from the North American Registry of Midwives—an organization accredited by NOCA—to practice as a Certified Professional Midwife ("CPM").[3] Williston obtained her CPM credential because it more accurately suited her "philosophical ideology" and her passion for out-of-hospital births.

Williston and her husband owned and operated A Mother's Love Birthing Center, L.L.C., (the "Birthing Center") in Independence, Missouri. Prior to the events at issue in this appeal, the Birthing Center had been denied licensure as an ambulatory surgical center by the Missouri Department of Health and Senior Services.[4] *See Williston v. Vasterling*, 536 S.W.3d 321, 326 (Mo. App. W.D. 2017). The Birthing Center was denied a license because it failed to satisfy the statutory and regulatory requirements for licensure that "patient care in a birthing center must be provided by a physician on staff or by a CNM with a collaborative practice agreement with a physician on staff." *Id.* at 335, 344. The Birthing Center has not had a physician on staff since 2011.

In May of 2012, Mother hired Williston to deliver Baby at the Birthing Center.[5] Mother and Father entered into an "Informed Disclosure & Consent for Midwifery Care" ("Consent

---

[3] An individual may obtain certification as a CPM through a process involving apprenticeship, portfolio evaluation, and examination. Another route is to complete a multi-year program at a college certified by the Midwifery Education Accreditation Council.

[4] "An 'ambulatory surgical center' is defined as 'any public or private establishment operated primarily for the purpose of performing surgical procedures or ***primarily for the purpose of performing childbirths***, and which does not provide services or other accommodations for patients to stay more than twenty-three hours within the establishment." *Williston*, 536 S.W.3d at 332 (emphasis in original) (quoting § 197.200(2)). "Section 197.205 requires all 'ambulatory surgical centers' to obtain a license from [the Department of Health and Senior Services]." *Id.*

[5] At all times Williston provided care to Mother and Baby, her nursing license was active and in good standing and she was credentialed as a Certified Professional Midwife.

Agreement") and a Financial Agreement with the Birthing Center, both of which were executed by Williston. The Financial Agreement provided that Mother "will pay a fee to [the Birthing Center] for the Services in the amount of $4,500" if paid by the 36th week of pregnancy, and if not paid by that time, "fees become $6,000." The Services were described as "OB/GYN, antepartum, postpartum care and out of hospital birth, or in hospital doula work (excluding all hospital charges), for transfers during birth." The Financial Agreement stated that the Services would be provided by "Rachel, CNM and Birth center staff."

When Mother hired Williston, she was about 27 weeks pregnant and had a due date of July 31, 2012. Beginning on May 3, 2012, Williston provided Mother with prenatal care. Mother advised Williston she had a family history of large babies. Williston recognized on June 25, 2012 that Mother may have a large baby when she sent Mother for an ultrasound. Based on the results of the ultrasound, Williston changed Mother's due date to July 25, 2012. Mother gained 60 pounds during her pregnancy. At the time of birth, Williston estimated Baby to weigh nine pounds, plus or minus a pound. Baby weighed 10.7 pounds at birth. Having a large baby increases the risk of the baby having difficulty passing through the birth canal, and of the mother experiencing excessive bleeding or postpartum hemorrhage after delivery. Williston's records did not reflect that she advised Mother of the risks posed by having a large baby.

Mother's water broke on August 7, 2012 around 11:30 a.m. She was not experiencing regular contractions at that time. Mother contacted Williston, who advised Mother to come to the Birthing Center when contractions became regular and hard or at 10:00 a.m. the following morning.

Mother reported to the Birthing Center at 10:00 a.m. the following day. Williston conducted an examination of Mother and confirmed that her water had broken, and she was still

not in labor. "Water breaking" is the colloquial term used to describe the rupture of the amniotic sac or membranes. When these membranes rupture before the onset of labor at term, it is known as "premature ruptured membranes" or PROM. This condition is considered to be prolonged if the membranes have been ruptured for more than 24 hours without the onset of labor. One function of these membranes is to keep germs and infection away from the baby. The longer the membranes remain ruptured without the mother going into labor, the greater the risk of infection, particularly if the mother undergoes multiple vaginal examinations. "Multiple" has been defined as greater than three to five examinations over the time period lasting from when the water breaks to when the baby is born. Mother received seven vaginal examinations from the time her water broke until Baby was born.

"Expectant management" refers to the practice of monitoring the mother after her water breaks—"or watchful waiting"—as opposed to inducing labor. Williston advised Mother that she had the option of going to the hospital to be induced or she could try another option, such as ingesting castor oil, which may strengthen the contractions. Mother opted to ingest castor oil. Williston went home while Mother remained at the Birthing Center with Father, Grandmother, and a Birthing Center employee. At 5:30 p.m. on August 8th, Mother was "admitted" to the Birthing Center. Mother went into "active labor" at 7:00 p.m. Williston's records indicate that at 8:27 p.m., "Cami, birth RN arrived."[6]

When a baby has a bowel movement in utero, the stool is referred to as "meconium." While Mother was in active labor, Williston observed moderate meconium in Mother's amniotic fluid. Meconium may be a sign that the baby is under stress. The presence of meconium increases the

---

[6] Williston testified that Cami was a doula, which is "someone who offers emotional support to women in labor" and is "not a medical job." Williston stated that during Mother's labor, Cami was acting as her birth assistant, and that no state-issued license is required to perform such role.

risk of infection to the mother and baby, and the baby may aspirate the meconium into his or her lungs, causing respiratory issues. Williston's records do not reflect that she advised Mother of the risks associated with the presence of meconium.[7]

Near the end of labor, Mother testified that Williston said Baby was stuck, and "[s]he got some olive oil and went in there and tried to turn the baby's head, tried to work it to where if she'd let go - - I guess she was stuck on my pelvic bone." Shoulder dystocia occurs "when the fetal head delivers and the shoulders are not following quickly. They're trapped in the maternal pelvis." Williston failed to document in her treatment records that a shoulder dystocia occurred or that she used olive oil during the delivery.

Baby was born on August 9, 2012 at 2:54 a.m. Williston placed Baby on Mother's chest after she was born and assessed Baby's "Apgar scores."[8] Mother noticed that "stuff was oozing out of [Baby's] nose and mouth" that she described as a "darkish grayish brownish icky color," "[t]hick like pudding" and "mucousy." Williston did not document anything in her records relating to Baby after her delivery other than a temperature of 100.7 and respirations of 92—both of which were elevated.

Mother did not deliver the placenta following birth, and she began to hemorrhage. After about ten minutes, Mother was still actively bleeding. Without informing Mother that she had the option of being transferred to the hospital, Williston attempted unsuccessfully to manually remove the placenta, causing it to shred. Mother was bleeding excessively and Williston was unable to control the bleeding. Mother testified that Williston yelled at her assistant to "get the shot, get the

---

[7] Williston testified that she did advise Mother of the risks, however she acknowledged that she did not document in her records that the discussion occurred.

[8] An "Apgar score" measures a baby's appearance, pulse, grimace, activity, and respiration. Williston testified she assessed Baby's Apgar scores at "1 minute" and "5 minutes," and the scores were not indicative of a baby "that's in trouble."

shot," the assistant had to be told where to find the shot, and Williston administered a shot into Mother's thigh. Williston had administered Pitocin to stop Mother's bleeding. Williston failed to document in her treatment records that Pitocin was administered.

Williston called 911 and Mother was transported to Centerpoint Medical Center in an ambulance, accompanied by Williston. Father, Grandmother, and Baby went to Centerpoint in the family vehicle. At the hospital Mother was placed under anesthesia and her placenta was removed. The treating physician, Dr. Lemberger, testified that the placenta "does not usually tear easily" and that Mother's placenta was shredded from someone trying to manually remove it. Mother also received 33-37 stitches for a peritoneal laceration. Additionally, due to Mother's significant blood loss, she received a blood transfusion of "two units of packed red blood cells." Mother was diagnosed with "postpartum hemorrhage, anemia, posthemorrhagic anemia, [and] 2nd degree perineal laceration." According to the pathology report for Mother's placenta, Mother had diffuse severe acute chorioamnionitis (an infection of the uterus or placenta) stage 2 and mild to moderate acute funisitis (an inflammation of the umbilical cord) involving all vessels of the umbilical cord. The placenta also indicated the presence of meconium.

Father and Grandmother had brought Baby into Centerpoint with them when Mother was admitted. Although Baby was not brought to the hospital because of concerns for her welfare, once there she was observed having respiratory distress and was evaluated by a physician. Baby was admitted to the Neonatal Intensive Care Unit and was diagnosed with respiratory distress, presumed sepsis, suspected pulmonary hypertension, jaundice, and feeding problems. Dr. Stapley, the neonatal physician who treated Baby, testified that "the clinical course here was very much like meconium aspiration syndrome" and Baby "most likely [had] meconium aspiration

syndrome." Baby was "on supplemental oxygen for several days" and received antibiotics "for a ten-day course." Baby was hospitalized from August 9 to August 19, 2012.

In February of 2016, the Nursing Board filed a complaint with the Administrative Hearing Commission (the "AHC") seeking authorization to discipline Williston's nursing license. The Nursing Board alleged that the care Williston provided to Mother and Baby violated various subsections of section 335.066—the statute which provides grounds for disciplining a nursing license. In June of 2017, the AHC held a two-day hearing, at which Williston and the Nursing Board presented evidence, including the testimony of numerous expert witnesses. Thereafter, the AHC issued its decision finding Williston's license was subject to discipline under section 335.066.2(5), (6)(b), (6)(c), (6)(e), (7), and (13), RSMo Supp. 2013. Specifically, the AHC found that Williston failed to work with a collaborating physician as required to practice as a CNM at a birthing center in violation of section 335.066.2(6)(e) and (7); the care Williston provided to Mother and Baby "constitute[d] incompetence, gross negligence, and repeated negligence" in violation of section 335.066.2(5); Williston engaged in misconduct, made misrepresentations, and her conduct was unprofessional in violation of section 335.066.2(6)(b), (c) and (e); and Williston violated the professional trust and confidence placed in her by Mother in violation of section 335.066.2(13).

The Nursing Board convened a hearing to determine the appropriate discipline to impose upon Williston's license. Williston presented argument and evidence at the hearing, and was questioned by the Nursing Board. Thereafter, the Nursing Board issued its Findings of Fact, Conclusions of Law, and Disciplinary Order revoking Williston's license.

Williston filed a petition for judicial review with the trial court. *See* § 536.110.1 ("Proceedings for review [of an agency decision] may be instituted by filing a petition in the circuit

court of the county of proper venue within thirty days after the mailing or delivery of the notice of the agency's final decision."); *see also* § 621.145 ("[A]ll final decisions of the administrative hearing commission shall be subject to judicial review as provided in and subject to the provisions of sections 536.100 to 536.140" and "[f]or purposes of review, the action of the commission and the order, if any, of the agency shall be treated as one decision."). After the parties filed briefing and the trial court heard argument, the trial court entered judgment affirming "the decision of the Administrative Hearing Commission, and the subsequent Order by the Missouri State Board of Nursing (the 'Agency Decision')."

Williston appealed to this Court, raising three claims of error. In her first point, she asserts that the "Board of Nursing erred in revoking [her] nursing license because it exceeded its jurisdiction . . . in that [Williston] was providing care solely in her capacity as a certified professional midwife, thus removing her from the Board of Nursing's statutory authority." In her second point, she asserts that the Board erred in revoking her nursing license "in that the Board of Nursing failed to present expert testimony proving the requisite standard of care applicable to certified professional midwives conducting out-of-hospital births or a violation thereof." In her third point, she argues that the Board's decision to revoke her nursing license was erroneous because it "was not supported by competent and substantial evidence . . . in that [Williston] was not grossly negligent, or repeatedly negligent, did not require a collaborative practice agreement, and the record does not support the complete revocation of [her] license."

Additional facts are set forth in our analysis.

**Standard of Review**

"When a circuit court's judgment [reviewing an administrative decision] is appealed, the appellate court does not review the circuit court's decision, but rather the agency decision, that is,

the AHC's findings and conclusions, and the board's discipline." *Bird v. Mo. Bd. of Architects, Prof'l Eng'rs, Prof'l Land Surveyors & Landscape Architects*, 259 S.W.3d 516, 520 (Mo. banc 2008); *see also Koetting v. State Bd. of Nursing*, 314 S.W.3d 812, 815 (Mo. App. W.D. 2010) ("We review the decision of the AHC and not the trial court's judgment."). This Court will uphold the agency decision and disciplinary order unless the agency action:

    (1) Is in violation of constitutional provisions;
    (2) Is in excess of the statutory authority or jurisdiction of the agency;
    (3) Is unsupported by competent and substantial evidence upon the whole record;
    (4) Is, for any other reason, unauthorized by law;
    (5) Is made upon unlawful procedure or without a fair trial;
    (6) Is arbitrary, capricious or unreasonable;
    (7) Involves an abuse of discretion.

*Kerwin v. Mo. Dental Bd.*, 375 S.W.3d 219, 225 (Mo. App. W.D. 2012) (quoting § 536.140)).[9]

"An agency's decision is unsupported by sufficient competent and substantial evidence upon the whole record only in the rare case when the decision is contrary to the overwhelming weight of the evidence." *Id.* (internal marks omitted). "In reviewing the agency's decision, we view the evidence objectively and not in the light most favorable to the agency's decision." *Id.* "However, we defer to the AHC on issues involving the credibility of witnesses and the weight and value to be given to their testimony." *Id.* "[T]he AHC is the sole judge of the credibility of witnesses and is free to believe all, part, or none of the testimony of any witness." *Id.* at 227 n.8 (internal citation and marks omitted).

"Our review of issues of law is *de novo*." *Koetting*, 314 S.W.3d at 815; *see also Kerwin*, 375 S.W.3d at 225 ("We will not substitute our judgment for that of the AHC on factual matters, but questions of law are matters for the independent judgment of this court." (internal marks omitted)).

---

[9] "While the decision reviewed on appeal is that of the AHC and not the circuit court, an appellate court reverses, affirms or otherwise acts upon the judgment of the trial court." *Bird*, 259 S.W.3d at 520 n.7; Rule 84.14.

## Analysis

### Point I

In her first point, Williston argues that the Board lacked authority to discipline her license because in providing care to Mother and Baby, she "acted solely in her capacity as a CPM and not as a RN/CNM" and the Nursing Board "lacks authority to discipline a CPM." We disagree that Williston was acting solely in her capacity as a Certified Professional Midwife. The AHC determined that, with regard to her care of Mother and Baby, Williston acted in her capacity as a Certified Nurse Midwife and engaged in the practice of nursing, finding that Williston "not only represented herself as a CNM and held herself out to the public and others as a CNM in connection with her care and treatment of [Mother and Baby], but also engaged in duties and responsibilities that are attributed to her as a CNM." We find that there was competent and substantial evidence to support this determination.[10]

The evidence showed that Williston held herself out as a CNM in connection with her care of Mother and Baby. Williston advertised and represented herself as practicing at a birthing center, which necessarily must be licensed by the Department of Health and Senior Services and staffed by either a physician or a CNM in collaboration with a physician. *See Williston*, 536 S.W.3d at 335 ("a birthing center must be licensed" and "patient care in a birthing center must be provided by a physician on staff or by a CNM with a collaborative practice agreement with a physician on

---

[10] Williston argues that *de novo* review applies to the claim of error raised in this point, asserting that whether the Nursing Board had jurisdiction or authority to discipline her license presents a question of law. However, her assertion that the Nursing Board had no authority to discipline her license is premised on her claim that she was acting solely as a CPM and not as a CNM when she provided care to Mother and Baby. The resolution of this question—in what capacity was she acting when she provided care—necessarily involves factual determinations. Generally, determinations involving the capacity in which a person acts present mixed questions of fact and law. *Cf. Teasdale & Assocs. v. Richmond Heights Church of God in Christ*, 373 S.W.3d 17, 22 (Mo. App. E.D. 2012) ("Whether a party was an agent during a given transaction is a mixed question of fact and law that is highly dependent upon the trial court's credibility determinations and assessments of the evidence."). Thus, we disagree that *de novo* review is exclusively applicable to this claim of error.

11

staff"); *see also* 19 CSR 30-30.090(5) (Patient care services at a birthing center "shall be under the direction of a physician or a CNM practicing pursuant to a collaborative practice arrangement with a physician."). On the Birthing Center's website, Williston identified herself as a CNM and stated that she obtained her CNM "so that [she] could provide a wider range of women's health services." Mother testified that she reviewed Williston's background information on the Birthing Center's website when she was searching for a midwife, and that she and Father "liked the experience, extensive experience that it appeared that [Williston] had and set up [their] first visit." Mother had noted that on the website "it said midwife, nurse-midwife."

The Consent Agreement and Financial Agreement that Williston provided Mother and Father identified Williston as having nursing credentials and indicated that care would be provided by physicians or those with nursing qualifications. The Consent Agreement advised that Williston was a CNM, that she was sometimes assisted by "[o]ther nursing students," that during birth "[c]are is given by both CPM's and CNM's," and that "the professional judgment of the midwives and/or their collaborating physicians must be relied upon exclusively for the safety of mother and baby." The Financial Agreement specifically identified Williston as a CNM and advised that "supervising physicians" will maintain the confidentiality of personal and clinical information.

Williston's progress notes relating to Mother from May 3, 2012 through September 10, 2012 included the credentials CNM after Williston's name. On June 25, 2012, Williston ordered an ultrasound for Mother and included the credentials CNM in Williston's typed address and signature block. Centerpoint Medical Center records support that Williston held herself out as a CNM: a Centerpoint discharge summary for Baby noted that "[t]his infant was born at a freestanding birthing center by nurse midwife" and that "Apgars of 8 & 9 [were] assigned by nurse midwife."

12

Not only did Williston hold herself out as a nurse midwife, but she engaged in the practice of nursing while caring for Mother and Baby. The practice of "professional nursing" is defined under Missouri law and Williston's actions caring for Mother and Baby fell within this statutory definition. Section 335.016(15) defines the practice of professional nursing as:

> [T]he performance for compensation of any act which requires substantial specialized education, judgment and skill based on knowledge and application of principles derived from the biological, physical, social and nursing sciences, including, but not limited to:
>
> (a) Responsibility for the teaching of health care and the prevention of illness to the patient and his or her family;
> (b) Assessment, nursing diagnosis, nursing care, and counsel of persons who are ill, injured or experiencing alterations in normal health processes;
> (c) The administration of medications and treatments as prescribed by a person licensed by a state regulatory board to prescribe medications and treatments;
> (d) The coordination and assistance in the delivery of a plan of health care with all members of a health team;
> (e) The teaching and supervision of other persons in the performance of any of the foregoing[.]

Mother and Father compensated Williston for the care she provided, which included assessing Mother's and Baby's conditions, giving counsel and care pursuant to that assessment, administering Pitocin to Mother, and attempting to remove Mother's placenta after delivering Baby. Williston does not dispute that the care she provided Mother and Baby fell within the scope of care a nurse midwife would provide, and she acknowledges that "there is overlap in the CNM and CMP scopes of practice." Rather, she argues that she and Mother had an understanding as to the services that would be provided, and that those services were CPM services, not nursing services. Setting aside that this argument contradicts Williston's claim that Mother "did not even pay attention to [Williston's] qualifications," such fact—taken as true—does not negate that the care Williston provided was within the scope of "professional nursing" as defined under Missouri law and that Williston held herself out as a CNM while providing that care.

13

We find Williston's other arguments challenging the Nursing Board's authority to discipline her license equally unpersuasive. Williston appears to argue that the Nursing Board lacks authority to discipline her license by operation of section 335.081. She notes that section 335.081(1) "specifically excludes from the definition of nursing '[t]he practice of any profession for which a license is required and issued pursuant to the laws of this state by a person duly licensed to practice that profession,'" and then asserts that a CPM certification is such a "license." But Williston's quotation of section 335.081 omits a key provision of the statute. Section 335.081(1), in its entirety, provides:

> ***So long as the person involved does not represent or hold himself or herself out as a nurse licensed to practice in this state***, no provision of sections 335.011 to 335.096 shall be construed as prohibiting: (1) The practice of any profession for which a license is required and issued pursuant to the laws of this state by a person duly licensed to practice that profession[.]

(emphasis added). As described above, Williston held herself out as a nurse licensed to practice in Missouri, and that fact alone renders inapplicable the protections of section 335.081 that Williston seeks to invoke.

Williston also relies on two cases in support of her claim that the Nursing Board cannot discipline her license, however we find neither of these cases provides the support Williston contends. Williston first cites to *Missouri State Medical Association v. State*, in which the Missouri Supreme Court addressed the standing of the plaintiff physician associations to challenge the constitutionality of section 376.1753—the statute legalizing the practice of midwifery by lay persons. *See* 256 S.W.3d at 86. The plaintiffs' claim of standing was premised on their concern that physicians would be subject to discipline by the Board of Registration for the Healing Arts if they coordinated patient treatment with midwives who were not licensed to practice medicine. *Id.* at 87-88. The Missouri Supreme Court rejected the plaintiffs' claim of standing, holding that

14

"physicians are no longer subject to discipline under section 334.100.2(10) for aiding, assisting, procuring, advising, or encouraging certified midwives to practice medicine" because section 376.1753 "expressly legalizes the services of certified midwives" and "certified midwives are not engaging in the practice of medicine as it is defined in section 334.010."[11] *Id.* at 88.

Williston argues that, pursuant to the court's holding in *Missouri State Medical Association*, "[j]ust as a midwife practicing under 376.1753 does not engage in the practice of medicine, the same midwife also does not engage in the practice of nursing in the context of an agency's disciplinary authority." She asserts that "[a]ny other ruling would be to wholly disregard the legislature's plain intent to practice midwifery." But *Missouri State Medical Association* does not speak to the Nursing Board's authority to discipline a nurse's license for providing nursing care while concurrently holding a CPM credential. And allowing such discipline does not "wholly disregard the legislature's plain intent to practice midwifery" because, as both parties acknowledge, discipline imposed by the Nursing Board on a nursing license has no effect on a CPM's ability to legally practice midwifery.

We find similarly misplaced Williston's reliance on *Leggett v. Tennessee Board of Nursing*, 612 S.W.2d 476 (Tenn. Ct. App. 1980), a case in which the Tennessee Court of Appeals reversed the state nursing board's revocation of a nurse's license, finding that the board did not have authority to discipline the nurse's license for services rendered as a midwife. However, in that case, unlike here, midwifery was "an unregulated entity under [state] law," the state Nursing Practice Act did "not deal with the midwife," and there was "no evidence or finding that [the nurse] represented herself as a nurse midwife." *Leggett*, 612 S.W.2d at 479-80. The Missouri Nursing Practice Act, unlike the Tennessee Nursing Practice Act, recognizes and provides control over the

---

[11] Section 334.010.1 provided that "It shall be unlawful for any person not now a registered physician within the meaning of the law to practice medicine . . . or engage in the practice of midwifery in this state[.]"

15

practice of nurse midwifery, *see* § 335.016(2) (defining an Advanced Practice Registered Nurse to include certified nurse midwives), (6) (defining a CNM as "a registered nurse who is currently certified as a nurse midwife by the American College of Nurse Midwives, or other nationally recognized certifying body approved by the board of nursing"), and Missouri has promulgated regulations addressing the practice of midwifery, *see, e.g.*, 20 CSR 2200-4.100(4); 19 CSR 30-30.090(5). Moreover, unlike the nurse in *Leggett*, Williston represented herself as a nurse midwife. For these reasons, the holding of *Leggett* provides no aid to Williston's argument that the Nursing Board lacked authority to discipline her license.

We find substantial and competent evidence supported the AHC's determination that Williston provided care to Mother and Baby in her capacity as a CNM, and thus the Nursing Board had authority to discipline Williston's nursing license. Point I is denied.

## *Point II*

In her second point, Williston asserts that different standards of care apply to in-hospital and out-of-hospital births, and the Nursing Board's revocation of her license was erroneous in that the Nursing Board "failed to present expert testimony proving the requisite standard of care applicable to certified professional midwives conducting out-of-hospital births or a violation thereof."

By way of background to the argument Williston raises in this point, five medical providers gave expert testimony relating to Williston's care in this matter. The three witnesses that provided expert testimony for the Nursing Board were Dr. Christopher Stapley (a neonatologist and Baby's treating physician at Centerpoint), Dr. Michelle Lemberger (an obstetrician/gynecologist and Mother's treating physician at Centerpoint), and Susan Myers (a hospital-based RN and CNM who did not treat Mother or Baby). Williston called two witnesses to provide expert testimony: Amy

16

Garrison (a CNM and CPM that works as a nurse midwife at a birth center pursuant to a collaborative practice agreement with a physician) and Dr. Elizabeth Allemann (a family and community medicine physician who had a personal relationship with Williston from their lobbying efforts to legalize the practice of midwifery by lay persons). Williston's witnesses had experience relating to out-of-hospital births; the Nursing Board's witnesses did not.

Generally, the testimony of the Nursing Board's witnesses supported that Williston did not act as an ordinary member of her profession would have when treating a patient under similar circumstances, and the testimony of Williston's witnesses supported that she conducted herself properly as a CNM, other than not having a collaborative practice agreement with a physician. In judging the credibility of the witnesses, the AHC specifically found "Lemberger, Stapley, and Myers to be more credible than Allemann, Garrison and Williston herself on numerous issues regarding the care and treatment of [Mother and Baby], including informed consent,[12] the handling of large babies, PROM, and meconium." The AHC rejected Williston's argument that "the standard of care that is required is to produce experts in 'out of hospital' births who provide opinions as to whether the standard of care was met."

We conclude that the Nursing Board was not required to prove Williston's conduct fell below a narrow standard of care specific to CNMs practicing in an out-of-hospital setting; rather, the Nursing Board met its burden by presenting expert testimony that Williston did not act as an ordinary member of her profession would have when treating a patient under similar circumstances. *See* § 335.066.2(5) (The standard of care which a nurse must exercise is "that

---

[12] The doctrine of "informed consent" has been defined as "[a] person's agreement to allow something to happen, made with full knowledge of the risks involved and the alternatives" and "[a] patient's knowing choice about treatment or a procedure, made after a physician or other healthcare provider discloses whatever information a reasonably prudent provider in the medical community would provide to a patient regarding the risks involved in the proposed treatment." *See Wuerz v. Huffaker*, 42 S.W.3d 652, 656 (Mo. App. E.D. 2001).

17

degree of skill and learning ordinarily used under the same *or similar circumstances* by the member of the . . . licensee's profession." (emphasis added)).

Although Williston argues that there are "drastic differences" between the standards of care for in- and out-of-hospital births, the deficiencies in Williston's care described by the Nursing Board's expert witnesses were not particular to any birth setting.[13] For example, the Nursing Board's experts testified that Williston: failed to adequately advise Mother of the risks associated with having a large baby, premature rupturing of the membranes, and meconium; subjected Mother and Baby to an increased risk of infection by performing seven vaginal examinations upon Mother after her water broke; failed to document in treatment records important events that occurred during labor and delivery, such as shoulder dystocia, administration of Pitocin, and information beyond the heart rate and respiration of Baby immediately after birth; and failed to provide heightened observation of Baby after her birth knowing that meconium was present in Mother's amniotic fluid. These acts and omissions of Williston, which the Nursing Board experts characterized as deviating from the standard of care, were not unique to Williston providing care in an out-of-hospital setting.

The Nursing Board met its burden to prove Williston's conduct fell below the applicable standard of care. Point II is denied.

---

[13] Williston does not provide any meaningful support for her assertion that there are "drastic differences" between the standards of care for in- and out-of-hospital births. She does not cite to evidence presented at the hearing, nor any other source, to support her claims that out-of-hospital births are more "supportive and physiologic, meaning the focus is on allowing the body to proceed naturally and only intervening when necessary, which differs from the protocol of hospital births," which "traditionally focus on prophylactic intervention." And although in her brief on appeal she points to specific citations in the transcript purporting to show that Dr. Allemann opined the standards of care for in- and out-of-hospital births are different, review of that testimony reveals only that Dr. Allemann testified that she had an opinion as to whether the standards are different; the cited testimony does not reflect what that opinion was, let alone the basis for the opinion.

In Point III, Williston argues that the Board's decision to revoke her nursing license was erroneous because it "was not supported by competent and substantial evidence . . . in that [Williston] was not grossly negligent, or repeatedly negligent, did not require a collaborative practice agreement, and the record does not support the complete revocation of [her] license."

Williston's point is multifarious, as in it she raises multiple independent claims of error. *See Sanders v. City of Columbia*, 602 S.W.3d 288, 296 n.5 (Mo. App. W.D. 2020) (a point relied on is multifarious in violation of Rule 84.04(d) if "it groups together multiple, independent claims rather than a single claim of error."). Williston first challenges the AHC's findings as to the grounds for discipline. She then challenges the level of discipline imposed by the Nursing Board, arguing that the Nursing Board acted arbitrarily and unreasonably and "use[d] an unfairly heavy disciplinary hand to revoke her nursing license." Although a multifarious point is subject to dismissal, we nonetheless review the merits of her claims. *See Sanders*, 602 S.W.3d at 296 n.5.

<u>Substantial basis for the AHC's findings</u>

The AHC found numerous independent grounds existed to discipline Williston's license; however, on appeal Williston only purports to challenge the AHC's findings that she practiced as a CNM without a collaborative physician as required by law and that her conduct constituted incompetence, gross negligence, and repeated negligence.[14]

We struggle to understand the legal framework of Williston's argument, as she appears to use the terms gross negligence, repeated negligence, and incompetence interchangeably. In her point relied on she asserts that there was not competent and substantial evidence to support the

---

[14] For example, Williston does not challenge the AHC's finding that her license was subject to discipline under section 335.066.2(6)(b) for "falsely representing to [Mother] that she was affiliated with a physician, and in so doing, indirectly obtained her as a patient."

findings that she was grossly and repeatedly negligent; she makes no mention of incompetence. In the argument section of her brief, however, she asserts that "the AHC found [her] incompetent in four areas" and "there was no substantial basis for such findings." She then addresses each of the "four areas"—informed consent, record keeping, monitoring procedures, and lack of collaborating physician—contesting the factual findings relating to each "area." She does not address the AHC's separate findings that Williston's care and treatment of Mother and Baby were grossly and repeatedly negligent, nor the factual support that the AHC described for such findings.

Gross negligence, repeated negligence, and incompetence are separate concepts encompassing different standards. *See Albanna v. State Bd. of Registration for the Healing Arts*, 293 S.W.3d 423, 431 (Mo. banc 2009) ("each term in the statute—incompetency, gross negligence, [and] repeated negligence—should be given its own individual meaning"); *Tendai v. State Bd. of Registration for the Healing Arts*, 161 S.W.3d 358, 369 (Mo. banc 2005) ("incompetency means something different than 'gross negligence' or 'repeated negligence'"), *overruled on other grounds by Albanna*, 293 S.W.3d at 428 n.2. "Incompetency" is "a state of being"; an incompetent medical provider is "unable or unwilling to function properly as a [provider]." *Albanna*, 293 S.W.3d at 436. "Repeated violations of the standard of care constitute repeated negligence, but in themselves, they do not constitute sufficient evidence to prove incompetency." *Id.* Finally, "gross negligence" is defined as "an act or course of conduct which demonstrates a conscious indifference to a professional duty that constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." *Tendai*, 161 S.W.3d at 367.

We do not address Williston's purported challenge to the findings that she was grossly and repeatedly negligent; although she raises this claim in her point relied on, she fails to further support the claim in the argument portion of her brief. *See Foraker v. Foraker*, 133 S.W.3d 84,

20

102 n.5 (Mo. App. W.D. 2004) (claims raised in a point relied on but not discussed in the argument portion of the brief are deemed abandoned). And even though Williston's challenge to the AHC's finding of incompetency is also unpreserved, as she does not raise the challenge in her point relied on, we nonetheless exercise our discretion to review this claim. *See Burg v. Dampier*, 346 S.W.3d 343, 354 (Mo. App. W.D. 2011) ("Arguments advanced in the brief but not raised in the point relied on are not preserved[.]"); *Nichols v. Div. of Emp't Sec.*, 399 S.W.3d 901, 904 (Mo. App. W.D. 2013) (this Court may review unpreserved claims *ex gratia*).

As described above, the AHC found Williston was incompetent based on her conduct related to "four areas." Williston challenges the AHC's findings as to each "area."

*Informed consent*

The AHC found Williston was incompetent based on her failure to provide Mother with informed consent relating to the issues that arose during the labor and delivery, and by not adequately informing Mother of the risks associated with having a large baby, premature rupture of membranes, meconium, and postpartum hemorrhaging. The evidence supports these findings. Specifically, the Nursing Board presented evidence that Williston failed to inform Mother of the risks posed to Mother and Baby from Mother's prolonged premature rupture of membranes, which included an increased risk of infection; gave inadequate informed consent when advising Mother that she could either go to the hospital to be induced or try an option such as ingesting castor oil; failed to inform Mother of the risks associated with the presence of meconium during labor, including the increased risk of infection to Mother and Baby and the risk that Baby may aspirate the meconium into her lungs, causing respiratory issues; failed to inform Mother that having a large baby increases the risk of the baby having difficulty passing through the birth canal, and of the mother experiencing excessive bleeding or postpartum hemorrhage after delivery; and failed

21

to discuss with Mother the option of going to the hospital rather than having Williston attempt to manually remove her placenta at the Birthing Center. Although Williston did provide Mother with the Consent Agreement before assuming her care, that agreement did not remedy the deficiencies described above relating to informed consent.

### Record keeping

The AHC's finding that Williston was incompetent in her recordkeeping was supported by evidence showing Williston failed to record: that a shoulder dystocia occurred during delivery, the use of olive oil during the delivery, the administration of Pitocin to stop Mother's hemorrhaging, and Baby's condition after birth (other than her heart rate and respirations immediately after birth). Although Williston argues there was no evidence a shoulder dystocia occurred or that she administered Pitocin, and therefore she could not be faulted for failing to record those events, we disagree. Relating to the administration of Pitocin, Mother testified at the hearing and in her deposition that Williston gave her "the shot." Williston admitted that she told Cami to get the Pitocin shot and administer the shot to Mother, however she did not know if Cami administered the shot because Williston "was busy doing what [she] was doing." Additionally, although Williston denied at the hearing that a shoulder dystocia occurred, other witnesses testified that, based on the description of Williston's actions during delivery, a shoulder dystocia likely occurred. Mother herself testified that Baby was stuck on her pelvic bone, and Williston tried to manually turn Baby.

### Monitoring procedures

The AHC found Williston was also incompetent "in her failure to follow the procedures recommended for intermittent auscultation and to properly record a baseline for [Baby]," noting that Williston "completely failed to perform any monitoring at all during the last hour before

22

[Baby] was born."[15] The evidence supports the AHC's findings in this regard. The American College of Nurse-Midwives recommends that intermittent fetal monitoring should be done "every 15 to 30 minutes in active labor; and then every 5 minutes in the pushing phase of labor." Williston acknowledges that there was no evidence showing she documented Baby's fetal heart tones during the last hour before birth, however she asserts that her "methods of fetal surveillance [did not cause] or fail[] to detect any distress or harm to [Baby]." This argument ignores the evidence presented that Williston's methods of monitoring were insufficient because they did not provide "enough information to know if the baby [was] doing well or [was] well-oxygenated," if the baby had decelerations in heart rate, or if the baby was in distress. Nor did Williston's method of monitoring allow someone outside the situation to understand what was happening. Thus, the evidence showed that, regardless whether Williston's method of monitoring failed to detect distress in Baby, it was insufficient, and suggested an inability or unwillingness to function properly as a CNM.

### Collaborative practice arrangement

The AHC found Williston was incompetent by caring for Mother and Baby without a collaborating physician. As we have previously found in Point I, Williston was acting as a CNM when she provided the instant care and thus was required by law to practice pursuant to a collaborative practice arrangement with a physician, which she did not do. *See Williston*, 536 S.W.3d at 335; *see also* 19 CSR 30-30.090(5); 20 CSR 2200-4.200(3)(F).

In sum, the AHC's determination that there was "cause to discipline Williston's license for incompetence" was supported by competent and substantial evidence.

---

[15] Williston performed intermittent auscultation to monitor Baby's heartbeat during labor, as opposed to "continuous fetal monitoring," which involves using a machine that continuously monitors fetal heart tones.

Severity of discipline imposed

In this same point, Williston also contests the severity of the discipline imposed by the Nursing Board, asserting that the record did not support complete revocation of her license. We disagree.

"The court on appeal rarely interferes with sanctions imposed by an administrative board which are within the statutory authority of the board." *Kerwin*, 375 S.W.3d at 231 (internal marks omitted). "A part of the expertise of the members of the Board consists of the ability, drawn from their knowledge of the industry practices and standards, to assess the gravity of the licensee's infractions, and to fit the sanction to the offense." *Id.* at 231-32 (internal marks omitted). Thus, "[a]n administrative agency's decision as to discipline will be upheld unless its determination is: unsupported by competent and substantial evidence; arbitrary, capricious or unreasonable; an abuse of discretion; or unauthorized by the law." *Id.* at 232 (internal marks omitted). "Discretion is abused when the ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of consideration." *Id.*

The discipline imposed by the Nursing Board was within the statutory range of discipline available to the Nursing Board. *See* § 335.066(3) (authoring the Nursing Board to censure or place a licensee on probation, or to suspend or revoke a nursing license). And although Williston argues that complete revocation of her license reflects the Nursing Board's "arbitrary and unreasonable disdain for the practice of midwifery," we find that the Nursing Board's decision to revoke her license was reasonable. The Nursing Board's disciplinary determination was made after a hearing at which numerous expert witnesses testified as to the deficiencies in Williston's care and evidence was presented that Williston misrepresented her practice to Mother as one that included

24

collaboration with a physician. Additionally, at the disciplinary hearing before the Nursing Board, which occurred after the AHC found cause to discipline Williston's license, Williston stated that she "would not change anything about [her] hands-on care," that "[t]here [was] no way to prevent these things from happening," and that it was "a real bummer" that Baby ended up being placed on antibiotics at the hospital. The Nursing Board found Williston's testimony "reflect[ed] a defiant position that indicate[d] either a lack of ability to understand the many things she did wrong or a refusal to acknowledge her past mistakes," and "lack[ed] compassion almost to the point of being flippant." We cannot say the Nursing Board's concern relating to Williston's testimony was unreasonable, and we find no arbitrary or capricious action or abuse of discretion on the part of the Nursing Board requiring appellate interference with its decision to revoke Williston's license.

Point III is denied.

## Conclusion

The judgment of the trial court affirming the collective rulings of the AHC, which found that cause existed to discipline Williston's license, and the Nursing Board, which revoked Williston's Missouri nursing license, is affirmed.

_____
EDWARD R. ARDINI, JR., JUDGE

All concur.

25